UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| JOHN M HEINEKE,<br><br>      Plaintiff,<br><br>   v.<br><br>SANTA CLARA UNIVERSITY, et al.,<br><br>      Defendants. | Case No. 17-CV-05285-LHK<br><br>**ORDER DENYING MOTIONS FOR PRELIMINARY INJUNCTION, GRANTING MOTION TO DISMISS, AND GRANTING MOTION TO STRIKE SUR-OPPOSITION**<br><br>Re: Dkt. Nos. 114, 126, 138, 145 |

On May 25, 2018, the Ninth Circuit reversed and remanded this Court's orders denying Plaintiff John Heineke's first and second motions for a preliminary injunction with instructions to analyze all four factors from *Winter v. Natural Resources Defense Council*, 555 U.S. 7, 24 (2008). Also before the Court are Defendants Santa Clara University and Jane Doe's motion to dismiss the First Amended Complaint, ECF No. 114, Plaintiff's third motion for a preliminary injunction, ECF No. 126, and Plaintiff's motion to strike Defendants' unauthorized sur-opposition, ECF No. 138. Having considered the submissions of the parties, the relevant law, the mandate on remand, and the record in this case, the Court DENIES Plaintiff's first two motions for a preliminary injunction, GRANTS the motion to dismiss, DENIES the third motion for a preliminary

1

injunction, and GRANTS the motion to strike Defendants' sur-opposition.

## I.  BACKGROUND

### A.  Factual Background

Plaintiff John Heineke ("Plaintiff") is a 79-year-old former tenured professor of economics at Santa Clara University ("SCU").  ECF No. 11 ("FAC") ¶¶ 1, 9-15.  In 2015, Jane Doe ("Doe"), then a student of his, accused Plaintiff of sexual harassment and filed a complaint with SCU's Office of EEO & Title IX.  FAC ¶¶ 28, 30, 32.  Doe chose not to pursue the complaint at that time. *Id.* ¶ 33.  Plaintiff denies the allegations and asserts that Doe made the allegations as a face-saving way to withdraw from her commitment to serve as Plaintiff's teaching assistant.  *Id.* ¶¶ 34, 43. Plaintiff alleges that Doe repeatedly met with Plaintiff to seek academic and career guidance, asked to go to lunch with Plaintiff, and told Plaintiff that he was "sweet," which Plaintiff contends show that Plaintiff did not sexually harass Doe.  *Id.* ¶¶ 18-19, 44, 54.

At some unspecified time, another student ("Student A") of Plaintiff's filed a complaint accusing Plaintiff of sexual harassment.  *Id.* ¶ 36.  SCU hired a third-party investigator to investigate the charges.  The investigator found that a preponderance of the evidence did not support Student A's allegations of sexual harassment.  *Id.* ¶ 37.  In the course of the investigation into Student A's claims, however, the investigator learned of Doe's complaint and interviewed her.  *Id.* ¶¶ 37-38.  The investigator then opened a formal investigation into Doe's complaint.  *Id.* ¶¶ 38-39.  Plaintiff asserts that Student A made her allegations because she was upset about a low grade she received in Plaintiff's class.  Plaintiff asserts that Doe agreed to resurrect her allegations to help Student A, with whom Plaintiff says Doe is friends.  *Id.* ¶¶ 34, 36.  Plaintiff also alleges that Doe agreed "to assist SCU in creating a pretext for firing Plaintiff and in covering up the fact that SCU was terminating Plaintiff because of his age."  *Id.* ¶ 43.

Following an investigation that included interviewing Doe and a number of witnesses, the investigator issued a report.  The FAC does not specify the report's findings.  Instead, the FAC only alleges that the investigation and witnesses were biased against Plaintiff and that SCU used

the report as pretext to suspend and terminate Plaintiff. *Id.* ¶¶ 39-40, 42-45. In the original complaint, however, Plaintiff alleged that the report found that Plaintiff had violated SCU's Gender-Based Discrimination and Sexual Misconduct Policy as well as Policy 311 of the Staff Policy Manual. ECF No. 1 ¶ 40; *see also* ECF No. 130-3 at 190 (letter from Provost Jacobs finding "it is more likely than not that [Plaintiff] violated the University's Policy on Unlawful Harassment and Unlawful Discrimination (Appendix F of the Faculty Handbook and Policy 311 of the Staff Policy Manual)").

On August 20, 2017, SCU threatened to terminate Plaintiff based on the sexual harassment report. FAC ¶ 45. Plaintiff internally appealed to SCU's president; while the appeal was pending, SCU suspended Plaintiff with pay from his teaching duties. *Id.* ¶ 46. SCU replaced Plaintiff with a "younger (mid-forties), much less qualified adjunct professor (less experienced or competent in the course materials)." *Id.* Plaintiff contends that news of his suspension quickly spread around campus. *Id.* Plaintiff alleges that the false accusations have "destroyed his good name and reputation as one of SCU's most well-established and prominent professors, have caused him to suffer diminishment and loss of his reputation, have caused Plaintiff and his wife severe emotional distress from anxiety about his future and reputation built over a lifetime, have lowered his standing in the eyes of fellow SCU faculty," "have prevented him from obtaining other comparable employment as an economics professor," and have "caused him . . . depression." *Id.* ¶¶ 34, 47.

On October 13, 2017, SCU's president affirmed the evidentiary findings of the report and also affirmed the decision to terminate Plaintiff's employment.[1] ECF No. 130-3 at 8. On October 24, 2017, SCU's provost informed Plaintiff that he could appeal SCU's president's decision to the Faculty Judicial Board ("FJB"). *Id.* Plaintiff appealed SCU's president's decision to the FJB. Plaintiff remained on paid suspension while the appeal to the FJB was pending. *Id.*

---

[1] The following facts are not pled in the FAC. Rather, they are drawn from the declarations submitted by the parties in connection to Plaintiff's preliminary injunction motion.

Case No. 17-CV-05285-LHK
ORDER DENYING MOTIONS FOR PRELIMINARY INJUNCTION, GRANTING MOTION TO DISMISS, AND GRANTING MOTION TO STRIKE SUR-OPPOSITION

The FJB hearing occurred from March 19-21, 2018. During the hearing, both sides were represented by counsel and had the opportunity to call witnesses, cross-examine witnesses, submit evidence, deliver opening and closing statements, and submit post-hearing briefs. Exh. 3 to PI Mot. Plaintiff objects to certain limitations of the FJB process, including that he was not allowed to call SCU's president as a witness, nor were the identities of some of the witnesses from the original investigation revealed. PI Reply at 5. In addition, Plaintiff contends that the FJB limited the scope of his cross-examination of Doe. *Id.* Plaintiff also argues that one of the FJB members, Professor Lawrence Nelson, was biased against Plaintiff. *Id.* However, the evidence shows that Plaintiff had the opportunity to ask Professor Nelson to recuse from the FJB hearing and Plaintiff explicitly "waive[d] any conflict of interest and d[id] not object to Professor Lawrence Nelson being on the Hearing Committee." ECF No. 130-3 at 386.

On April 30, 2018, the FJB issued a 6-page unanimous decision upholding the decision to fire Plaintiff. Exh. 3 to PI Mot. The FJB stated that it "found Ms. Jane Doe's testimony compelling and credible." *Id.* at 4. To the contrary, the FJB "doubted the credibility of much of Professor Heineke's testimony. [The FJB] found it doubtful, for example, that a Professor confronted with a student making allegations of gross sexual misconduct, which allegations the Professor regarded as completely fabricated, the allegations coming as a total shock and surprise to him, would in the immediate aftermath of such allegations continue to urge that student to serve as a teaching assistant for him." *Id.* The FJB went on, "Professor Heineke claimed that he did so with Ms. Jane Doe, despite his shock at her allegations, because he needed a teaching assistant and had no other options. For a professor of Heineke's experience and stature, this explanation beggars credulity." *Id.* The FJB concluded that "the more obvious explanation is that the allegations against him did not come as a complete shock, did not strike him as completely made-up, but rather struck him as a *characterization* of behavior that he recognized had happened, but which he had interpreted very differently. But his *testimony* was that these very severe allegations were completely fabricated . . . ." *Id.*

The FJB went on to address several of the same arguments that Plaintiff relies on in the instant case, including Plaintiff's contention that Doe's friendly emails to Plaintiff and her repeated visits to his office contradict Doe's account of sexual harassment. *Id.* at 5. The FJB noted that "[t]his evidence fogs our apprehension of the facts of what transpired." *Id.* The FJB nevertheless concluded that Doe's explanation that she wanted to maintain a good relationship with her professor and hoped to secure a TA position was "plausible, especially given the power imbalance between a professor and a student. The emails are not inconsistent with a finding of harassment, but they do raise doubts about whether such harassment was happening." *Id.* The FJB also addressed Plaintiff's allegation that there was a conflict of interest in the investigation because Belinda Guthrie, SCU's EEO and chief Title IX officer, was affiliated with NCHERM, the firm that Guthrie hired to do the investigation. *Id.* at 5-6. The FJB concluded that it would have been better for Guthrie to have disclosed the relationship or to have hired a firm with which she was not affiliated, but the FJB also determined that it "c[ould not] say that [any conflict] rendered the entire investigation unfair, nor its conclusions unreasonable." *Id.* at 6. The FJB thus affirmed the investigation's findings and the decision to terminate Plaintiff's employment.

Two members of the FJB authored a concurring opinion in which they urged SCU to revisit the procedure for its disciplinary proceedings. *Id.* at 7. These members wrote: "Of course, employees do not in general have a right to a trial, or the right to question witnesses with the aid of counsel, before they can be terminated for violation of workplace policies. But if an employee *is* to be afforded such rights (as they are provided here by the Faculty Handbook), then it makes far more sense for the employee to enjoy those rights at the 'trial stage,' where the employee enjoys a presumption of innocence, rather than at the appellate stage, where they must overcome a finding of guilt." *Id.* These members also noted, however, that "[w]e do not consider the existing procedures to have produced a result in this case that was clearly wrongful." *Id.*

Professor Nelson wrote a separate concurring opinion in which he rejected the contention that "a professor accused of sexual harassment or any other form of sexual misconduct has an

ethical 'right to confront his accusers' or a 'right to question them' during the University's investigative process—if by this it is meant that the complainant is in any sense required to undergo the questioning of the alleged wrongdoer (or his lawyer) in person in order to have her complaint taken seriously and acted upon by the University." *Id.* at 8.  Professor Nelson went on:

> The accused certainly has a right to know the full substance of the complaint and have an adequate and fair opportunity to respond to it, but he has no right to personally confront the complainant who may still be suffering from the impact of misconduct, assuming it actually occurred.  (I recall how upset and disturbed Ms. Jane Doe was when she testified before us with Professor Heineke sitting in front of her.)

*Id.*  Professor Nelson also observed that Plaintiff "never explained to my satisfaction why Ms. Jane Doe would fabricate her allegations" or why she would agree to testify more than two years later if her allegations were false.  Finally, Professor Nelson concluded that he had heard or seen no evidence to support either Plaintiff's contention that Plaintiff was discriminated against because of his age or Plaintiff's contention that "numerous individuals connected to this case (John Ottoboni, Fr. Engh, Provost Jacobs, Belinda Guthrie, and Michael Henry) were biased against him and actively seeking to find him liable for the alleged misconduct and fired." *Id.* at 9.

SCU terminated Plaintiff's employment on May 1, 2018.  Exh. 1 to PI Mot.

**B.    Procedural History**

On September 12, 2017, Plaintiff filed a complaint against Defendants SCU and a named former student alleging age discrimination, due process violations, wrongful termination, intentional infliction of emotional distress, negligent infliction of emotional distress, breach of contract, breach of the covenant of good faith and fair dealing, and defamation.  ECF No. 1.

**1.    First Emergency Motion for Temporary Restraining Order or Preliminary Injunction**

On September 13, 2017, while Plaintiff was suspended with pay pending resolution of his appeal to the SCU President of the Provost's decision to terminate Plaintiff, ECF No. 22 at 3, Plaintiff filed an emergency motion for a temporary restraining order or preliminary injunction, ECF No. 14.  Also on September 13, 2017, the Court ordered SCU to respond to the emergency

6

motion. ECF No. 16. SCU responded on September 14, 2017. ECF No. 68. On September 15, 2017, the Court denied Plaintiff's emergency motion because the Court found that Plaintiff's alleged harms—reputational injury, loss of job, and emotional distress—were not irreparable under United States Supreme Court and Ninth Circuit precedent. *Id.*

On September 16, 2017, Plaintiff filed a notice of appeal to the Ninth Circuit Court of Appeals. ECF No. 23. Plaintiff sought a temporary restraining order from the Ninth Circuit, which the Ninth Circuit denied in a summary order. ECF No. 25.

### 2. Defendants' First Motion to Dismiss

On October 3, 2017, Defendants filed a motion to dismiss the complaint in this Court. ECF No. 69. On October 23, 2017, Defendants filed an administrative motion to allow the named defendant to proceed under pseudonym. ECF No. 71. On October 27, 2017, Plaintiff filed an opposition to the administrative motion to proceed under pseudonym. ECF No. 86. Also on October 27, 2017, Plaintiff filed an opposition to the motion to dismiss. ECF No. 34. On November 8, 2017, Plaintiff filed a reply in support of the motion to dismiss. ECF No. 70.

### 3. Plaintiff's Second Motion for a Preliminary Injunction

On November 9, 2017, Plaintiff filed a second emergency motion for a preliminary injunction. ECF No. 37. The Court struck Plaintiff's motion for failure to comply with the Civil Local Rules governing page limits. ECF No. 38. On November 13, 2017, Plaintiff refiled the emergency motion for preliminary injunction based on his alleged imminent firing. Plaintiff's motion included a request for an evidentiary hearing. ECF No. 39. The Court directed SCU to file a response by November 15, 2017. ECF No. 40. The Court also set a hearing for the preliminary injunction motion for November 17, 2017 and ordered the parties to file statements related to Plaintiff's request for an evidentiary hearing. ECF No. 46.

SCU filed an opposition to the emergency motion for a preliminary injunction on November 15, 2017, ECF No. 75, and both parties filed statements outlining their positions on Plaintiff's requested evidentiary hearing, ECF Nos. 76, 90. Notably, Plaintiff envisioned calling at

United States District Court
Northern District of California

least 18 witnesses and taking at least 12 hours of testimony. ECF No. 90.

On November 16, 2017, the Court filed an order granting Plaintiff's request for an evidentiary hearing but limiting each side to two hours of witness testimony. ECF No. 50. The Court also granted Defendants' request for the named student-defendant to proceed under the pseudonym of "Jane Doe." ECF No. 54.

Also on November 16, 2017, the Court ordered Plaintiff to file a declaration under penalty of perjury stating whether Plaintiff would file an appeal to the Faculty Judicial Board, as such an appeal would render Plaintiff's second request for a preliminary injunction premature. ECF No. 51. Plaintiff filed a declaration stating that he had decided to file an appeal to the Faculty Judicial Board. ECF No. 92. Accordingly, the Court denied Plaintiff's motion for a preliminary injunction because Plaintiff's status had not materially changed since his first motion for a restraining order or preliminary injunction. ECF No. 55. Specifically, Plaintiff remained on paid suspension pending exhaustion of his administrative remedies at SCU. *Id.* at 2. As such, the Court's reasoning in its Order denying the first motion for a temporary restraining order or preliminary injunction still applied. *Id.* The Court vacated the associated hearing. *Id.*

### 4. Defendants' Anti-SLAPP Special Motion to Strike

On November 13, 2017, Defendants filed a special motion to strike the complaint. ECF Nos. 72. On November 17, 2017, Plaintiff filed an opposition to the special motion to strike. ECF No. 56. On November 22, 2017, Defendants filed a reply. ECF No. 62. Also on November 28, 2017, Plaintiff filed an administrative motion for permission to file a sur-reply on the anti-SLAPP special motion to strike. ECF No. 64. The Court denied the administrative motion on November 29, 2017. ECF No. 65. On November 30, 2017, Plaintiff filed a second notice of appeal, this time challenging the Court's second order denying a preliminary injunction, as well as the Court's order allowing Doe to proceed under pseudonym. ECF No. 67.

### 5. Order Granting in Part and Denying in Part Anti-SLAPP Motion, Granting Motion to Dismiss

On December 5, 2017, the Court granted in part and denied in part Defendants' anti-

8

SLAPP motion to strike and granted in full Defendants' motion to dismiss. ECF No. 99. With respect to the anti-SLAPP motion, the Court first denied the motion as to the § 1983 claim and the ADEA claim, to the extent Plaintiff pled an ADEA claim, because the anti-SLAPP statute may only be used to strike state law claims. *Id.* at 9 & n.2. The Court next denied the anti-SLAPP motion as to the wrongful discharge, breach of contract, and breach of the implied covenant of good faith and fair dealing causes of action because SCU's decisions to suspend or discharge Plaintiff were the actions underpinning Plaintiff's claims, rather than any protected speech. *Id.* at 12 (citing *Park v. Bd. of Trustees of Cal. State Univ.*, 393 P.3d 905, 907-11 (Cal. 2017); *Ku v. Dibaji*, 2017 WL 3205809 (Cal. Ct. App. July 28, 2017) (unpublished); *Nam v. Regents of Univ. of Cal.*, 205 Cal. Rptr. 3d 687, 695-96 (Ct. App. 2016)). The Court granted with prejudice the anti-SLAPP motion to strike Plaintiff's intentional infliction of emotional distress and negligent infliction of emotional distress claims against SCU as barred by California's workers' compensation exclusivity rule. *Id.* at 14-16. The Court denied the anti-SLAPP motion as to the intentional infliction of emotional distress claim as to Doe but granted with prejudice the motion as to the negligent infliction of emotional distress claim as to Doe. *Id.* at 17-24. Finally, the Court denied the anti-SLAPP motion as to the defamation claim against both Defendants. *Id.* at 24-26.

Turning to the motion to dismiss, the Court first analyzed Plaintiff's § 1983 claim for substantive and procedural due process violations. *Id.* at 27. "To state a claim for relief in an action brought under § 1983, [a plaintiff] must establish that [he] w[as] deprived of a right secured by the Constitution or laws of the United States, and that the alleged deprivation was committed under color of state law." *Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 49-50 (1999). "Like the state-action requirement of the Fourteenth Amendment, the under-color-of-state-law element of § 1983 excludes from its reach 'merely private conduct, no matter how discriminatory or wrongful.'" *Id.* at 50 (quoting *Blum v. Yaretsky*, 457 U.S. 991, 1002 (1982)). Thus, "[i]n order to recover under § 1983 for conduct by the defendant, a plaintiff must show 'that the conduct allegedly causing the deprivation of a federal right must be fairly attributable to the State.'"

*Caviness v. Horizon Community Learning Center, Inc.*, 590 F.3d 806, 812 (9th Cir. 2010) (quoting *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 937 (1982)).

The Court found that Plaintiff failed to establish that SCU was a state actor for the purposes of his § 1983 claim. First, the Court reasoned that Plaintiff's allegation that SCU receives some unspecified amount of federal funding does not by itself transform a private institution into a state actor because the United States Supreme Court has said that "[t]he Government may subsidize private entities without assuming constitutional responsibility for their actions." ECF No. 99 at 29 (quoting *S.F. Arts & Athletics, Inc. v. U.S. Olympic Committee*, 483 U.S. 522, 544 (1987) (citing *Blum*, 457 U.S. at 1011; *Rendell-Baker v. Kohn*, 457 U.S. 830, 840 (1982))). The Court found that other courts addressing this issue routinely hold that the receipt of government funds does not by itself transform a private actor into a state actor. *Id.* (citing *Rendell-Baker*, 457 U.S. at 831-33, 840; *Caviness*, 590 F.3d at 808-09, 818; *Faparusi v. Case W. Reserve Univ.*, 711 F. App'x 269, 275-76 (6th Cir. Oct. 4, 2017) (unpublished); *Gross v. R.T. Reynolds, Inc.*, 487 F. App'x 711, 719 (3d Cir. 2012) (unpublished); *Grosvenor v. Des Moines Area Community College*, 980 F.2d 734, at *2 (8th Cir. 1992) (unpublished); *Johnson v. Sutter Delta Med. Center*, No. C 11-03628 SI, 2011 WL 5444319, at *2 (N.D. Cal. Nov. 9, 2011); *Visintini v. Hayward*, No. C-08-5393 EMC, 2009 WL 2413356, at *3 (N.D. Cal. Aug. 5, 2009)).

Second, the Court found that Plaintiff's argument in his opposition that SCU acted under color of state law because its action was compelled by Title IX did not appear in the complaint. *Id.* at 30. Nonetheless, the Court went on to analyze the Title IX theory and found it insufficient to establish state action. *Id.* at 31. The Court noted that Plaintiff did not contend that it was the mere fact that SCU conducted an investigation, as required by law, that deprived him of due process. Nor did Plaintiff allege that any state or federal law, including Title IX, compelled SCU to conduct the investigation in a certain way or come to any particular decision about his termination. Plaintiff's argument thus amounted to a contention that "a generally applicable statutory requirement, without more, . . . is sufficient to hold a private employer responsible as a

10

governmental actor." *Sutton v. Providence St. Joseph Medical Center*, 192 F.3d 826, 837 (9th Cir. 1999). The Court stated that the Ninth Circuit already considered and rejected this argument in *Sutton*. *See id.* at 837-39. Specifically, in *Sutton*, the plaintiff argued that a private medical center acted under color of state law when the medical center refused to hire him if he did not provide his social security number, as required by law. *Id.* at 829. The Ninth Circuit held that complying with a generally applicable law was not enough to transform a private entity into a state actor. It explained:

> To accept Plaintiff's argument would be to convert every employer—whether it has one employee or 1,000 employees—into a governmental actor every time it complies with a presumptively valid, generally applicable law, such as an environmental standard or a tax-withholding scheme. Private employers would then be forced to defend those laws and pay any consequent damages, even though they bear no real responsibility for the violation of rights arising from the enactment of the laws. "Statutes and laws regulate many forms of purely private activity, such as contractual relations and gifts, and subjecting all behavior that conforms to state law to the Fourteenth Amendment would emasculate the [government] action concept."

*Id.* at 838-39 (alteration in original) (quoting *Adams v. S. Cal. First Nat'l Bank*, 492 F.2d 324, 330-31 (9th Cir. 1974)). Moreover, the Ninth Circuit concluded that such an approach would be inconsistent with U.S. Supreme Court precedent. *Id.* at 839-41. This Court thus dismissed Plaintiff's § 1983 claim with leave to amend as to SCU but with prejudice as to Doe. ECF No. 99 at 32.

With respect to the ADEA claim, the Court noted that "as an initial matter, it is not even clear that Plaintiff has attempted to allege an ADEA claim. The caption of the Complaint lists the second cause of action as 'ADEA Violations (29 U.S.C. § 631 et seq.)' and the Complaint invokes federal jurisdiction based in part on the ADEA." *See* ECF No. 1 ¶ 1. "However, the body of the Complaint does not contain an ADEA cause of action. Rather, the body of the Complaint only contains a wrongful discharge cause of action that mentions age discrimination in passing." *See id.* ¶¶ 57-61. The Court nevertheless went on to analyze Plaintiff's putative ADEA claim so that Plaintiff would have notice of any such claim's deficiencies:

Even setting this anomaly in pleading aside, the Complaint contains only conclusory allegations that SCU discriminated against Plaintiff based on his age. In the first paragraph of the Complaint, Plaintiff states that SCU threatened "to suspend and/or terminate Plaintiff from his tenured position as a professor at SCU due to his being 79 years old." Compl. ¶ 1. In paragraph 55, Plaintiff asserts that he "believes and will prove the real reason SCU is seeking to suspend or terminate him is age discrimination in order to avoid paying his tenured salary." Compl. ¶ 55. In paragraph 61, Plaintiff alleges that "SCU's failure to follow its policies as well as state and federal law was done with malice or with reckless indifference to Plaintiff Heineke's federally protected rights and was done to discriminate against him because of his age – he is 79 years old." Compl. ¶ 61. Finally, in a declaration that was not signed but which Plaintiff swore was correct in an attached email, Plaintiff stated that he is 79 years old. Heineke Decl. ¶ 1. In addition, Plaintiff states that he is "informed and believe[s] that the SCU Business School is seeking to save money and that firing [him], a tenured professor, is a way for SCU to save $100,000/year by replacing [him] with an untenured or adjunct professor." *Id.* ¶ 31. Plaintiff added that he believes that "the sexual harassment accusation is being used as a pretext to fire [him] because of [his] age and high compensation, so SCU can save money." *Id.*

These allegations fail to sufficiently plead an ADEA violation. Aside from reciting that Plaintiff is 79 years old, Plaintiff does not allege any direct indication that he was fired because of his age. As a result, Plaintiff instead must establish a prima facie case of discriminatory intent using circumstantial evidence, but the Complaint falls short here, too. Specifically, Plaintiff does not allege that he was replaced with "a substantially younger employee[] with equal or inferior qualifications." *Coleman*, 232 F.3d at 1281. Instead, Plaintiff alleges that SCU would seek to replace him with "an untenured or adjunct professor." Heineke Decl. ¶ 31.

In his Opposition, Plaintiff attempts to conflate the age of any replacement with tenure status and salary. For example, Plaintiff states that he has alleged that SCU used the sexual harassment allegations "as a pretext . . . to terminate Professor Heineke, a 79-year old tenured professor and replace him with a younger, cheaper, adjunct professor, and SCU admits it has done so." MTD Opp. at 12 (internal citations omitted); *see also id.* at 16 (repeating assertion that Plaintiff has alleged his replacement is "a younger, cheaper adjunct professor"). Plaintiff misstates the record, and the Court cautions Plaintiff to take greater care in characterizing the record in the future. Neither the Complaint nor Plaintiff's declaration allege that any replacement for Plaintiff will be younger than Plaintiff. As stated above, paragraph 31 of Plaintiff's declaration, upon which Plaintiff relies here, only states that his replacement would be untenured and paid less. It does not state that any replacement would be younger. Moreover, although the Court limits its review on a motion to dismiss to the facts alleged in the Complaint and any judicially noticeable facts, the Court notes that Plaintiff's other declarations similarly lack any allegations as to the replacement's age. *See* ECF No. 19 ¶ 3 (separate Plaintiff declaration making same claim about salary and tenure status of replacement but failing to mention age); ECF No. 39- 1 at 42

¶ 37 (separate Plaintiff declaration identifying replacement as adjunct professor without mentioning the adjunct professor's age). Similarly, the Chacko declaration states only that tenured professors "are paid substantially more than adjunct professors." ECF No. 21 ¶ 3. Moreover, the Guthrie declaration, which Plaintiff cites for the proposition that SCU has admitted to hiring a younger replacement, does not mention the age of any replacement. It says: "SCU has already made arrangements to have another faculty member cover Plaintiff's courses and changing that at this time will cost SCU money and will inconvenience the students and faculty scheduled to teach Plaintiff's courses." ECF No. 17-1 ¶ 10.

While tenure status or salary may be correlated with age, alleging that an employment decision was made based on a separate characteristic that correlates with age is not sufficient to state an ADEA claim, as the following decisions of the United States Supreme Court and Ninth Circuit demonstrate. In *Hazen Paper Co.* [*v. Biggins*, 507 U.S. 604 (1993)], the United States Supreme Court addressed "whether an employer violates the ADEA by acting on the basis of a factor, such as an employee's pension status or seniority, that is empirically correlated with age." 507 U.S. at 608. The United States Supreme Court explained that "[i]t is the very essence of age discrimination for an older employee to be fired because the employer believes that productivity and competence decline with old age." *Id.* at 610. "Congress' promulgation of the ADEA was prompted by its concern that older workers were being deprived of employment on the basis of inaccurate and stigmatizing stereotypes." *Id.* The United States Supreme Court noted, however, that "[w]hen the employer's decision is wholly motivated by factors other than age, the problem of inaccurate and stigmatizing stereotypes disappears. This is true even if the motivating factor is correlated with age, as pension status typically is." *Id.* at 611.

With regard to an employee's years of service, for example, the United States Supreme Court explained that "an employee's age is analytically distinct from his years of service," even though age and years of service may often be correlated. *Id.* "An employee who is younger than 40, and therefore outside the class of older workers as defined by the ADEA, may have worked for a particular employer his entire career, while an older worker may have been newly hired. Because age and years of service are analytically distinct, . . . it is incorrect to say that a decision based on years of service is necessarily 'age based.'" *Id.* (internal citation omitted). As a result, a decision to fire an older employee solely because he had enough years of service to be close to vesting his pension benefits would not constitute discriminatory treatment on the basis of age. The United States Supreme Court explained, "The prohibited stereotype ('Older employees are likely to be ___') would not have figured in this decision, and the attendant stigma would not ensue." *Id.* at 612. The United States Supreme Court noted that such an action may not be legal, "[b]ut it would not, without more, violate the ADEA." *Id.*

The Ninth Circuit applied *Hazen Paper Co.* in *Turney v. Beltservice Corp.*, 92 F.3d 1194 (9th Cir. 1996) (unpublished). In *Turney*, the plaintiff argued that he was terminated because of his high salary, which was related to his age, and that

13

his replacement "represented younger, cheaper labor to the company." *Id.* at *2. The Ninth Circuit concluded that *Hazen Paper Co.* controlled because "the motivating factor for terminating Turney appears to be one which is related to, but not the same as, his age." *Id.*; *see also Flynn v. Portland General Elec. Co.*, 958 F.2d 377, at *7 (9th Cir. 1992) (unpublished) ("A desire to cut costs does not necessarily equate with an intent to discriminate on the basis of age . . . ."). As a result, in the instant case, not only has Plaintiff failed to plead that he was replaced with a substantially younger employee, but Plaintiff has also pled facts that, when accepted as true, as the Court must on a motion to dismiss, "establish that he cannot prevail on his . . . claim." *Weisbuch*, 119 F.3d at 783 n.1 (quoting *Warzon*, 60 F.3d at 1239). Specifically, Plaintiff has pled that the motivating factor in SCU's decision to suspend him was a desire to cut costs by replacing Plaintiff, a tenured, highly paid professor, with an untenured, lower-paid professor. While tenure status and salary may often relate to age, they are not the same as age. *See Hazen Paper Co.*, 507 U.S. at 612; *Turney*, 92 F.3d 1194, at *2.

ECF No. 99 at 36-39.

The Court thus granted the motion to dismiss the ADEA claim with leave to amend as to SCU and with prejudice as to Doe. Having dismissed any possible federal causes of action, the Court then declined to exercise supplemental jurisdiction over the state law causes of action. *Id.* at 40-41. The Court noted that if Plaintiff "fails to cure the § 1983 and ADEA deficiencies identified in this order, those claims will be dismissed with prejudice." *Id.* at 45.

### 6. First Amended Complaint and Motion to Dismiss First Amended Complaint

On February 2, 2018, Plaintiff filed a First Amended Complaint. ECF No. 111 ("FAC"). On February 16, 2018, Defendants filed a motion to dismiss the FAC. ECF No. 114 ("MTD"). On March 9, 2018, Plaintiff filed an opposition to the motion to dismiss. ECF No. 118 ("MTD Opp'n"). On March 23, 2018, Defendants filed a reply. ECF No. 119 ("MTD Reply").

### 7. Third Motion for Preliminary Injunction and Ninth Circuit Decision

On May 10, 2018, Plaintiff filed a third motion for preliminary injunction. ECF No. 145 ("PI Mot."). On May 24, 2018, Defendants filed an opposition to the motion for preliminary injunction. ECF No. 130 ("PI Opp'n"). On May 25, 2018, the Ninth Circuit issued a memorandum disposition reversing the Court's orders denying Plaintiff's first and second motions for a preliminary injunction and remanding for the Court to analyze all four preliminary injunction factors. ECF No. 135. On May 30, 2018, Defendants filed a "sur-opposition" to respond to the

14

Ninth Circuit decision. ECF No. 136. Also on May 30, 2018, Plaintiff filed a reply in support of the motion for a preliminary injunction. ECF No. 137 ("PI Reply"). On May 31, 2018, Plaintiff filed a motion to strike Defendants' sur-opposition. ECF No. 138. Defendants did not respond to the motion to strike the sur-opposition. Because Defendants did not seek or receive permission to file the sur-opposition, Plaintiff's motion to strike the sur-opposition is GRANTED.

The mandates from the Ninth Circuit issued on June 18, 2018 and June 19, 2018. ECF Nos. 142, 143.

## II.  LEGAL STANDARD

### A.  Motion to Dismiss Pursuant to Federal Rule of Civil Procedure 12(b)(6)

Pursuant to Federal Rule of Civil Procedure 12(b)(6), a defendant may move to dismiss an action for failure to allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal citations omitted). For purposes of ruling on a Rule 12(b)(6) motion, the Court "accept[s] factual allegations in the complaint as true and construe[s] the pleadings in the light most favorable to the nonmoving party." *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008).

However, a court need not accept as true allegations contradicted by judicially noticeable facts, *Shwarz v. United States*, 234 F.3d 428, 435 (9th Cir. 2000), and the "[C]ourt may look beyond the plaintiff's complaint to matters of public record" without converting the Rule 12(b)(6) motion into one for summary judgment, *Shaw v. Hahn*, 56 F.3d 1128, 1129 n.1 (9th Cir. 1995). Nor is the Court required to "assume the truth of legal conclusions merely because they are cast in the form of factual allegations." *Fayer v. Vaughn*, 649 F.3d 1061, 1064 (9th Cir. 2011) (per curiam) (quoting *W. Mining Council v. Watt*, 643 F.2d 618, 624 (9th Cir. 1981)). Mere

15

"conclusory allegations of law and unwarranted inferences are insufficient to defeat a motion to dismiss." *Adams v. Johnson*, 355 F.3d 1179, 1183 (9th Cir. 2004); *accord Iqbal*, 556 U.S. at 678. Furthermore, "'a plaintiff may plead [him]self out of court'" if he "plead[s] facts which establish that he cannot prevail on his . . . claim." *Weisbuch v. County of Los Angeles*, 119 F.3d 778, 783 n.1 (9th Cir. 1997) (quoting *Warzon v. Drew*, 60 F.3d 1234, 1239 (7th Cir. 1995)).

## B.     Motion for a Preliminary Injunction

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Natural Res. Def. Council*, 555 U.S. 7, 24 (2008). "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Id.* at 20. The party seeking the injunction bears the burden of proving these elements. *Klein v. City of San Clemente*, 584 F.3d 1196, 1201 (9th Cir. 2009). "The Ninth Circuit weighs these factors on a sliding scale, such that where there are only 'serious questions going to the merits'—that is, less than a 'likelihood of success on the merits'—a preliminary injunction may still issue so long as 'the balance of hardships tips *sharply* in the plaintiff's favor' and the other two factors are satisfied." *Short v. Brown*, --- F.3d ---, 2018 WL 3077070, at *3 (9th Cir. 2018) (quoting *Shell Offshore, Inc. v. Greenpeace, Inc.*, 709 F.3d 1281, 1291 (9th Cir. 2013)). The issuance of a preliminary injunction is at the discretion of the district court. *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011).

## C.     Leave to Amend

Under Rule 15(a) of the Federal Rules of Civil Procedure, leave to amend "shall be freely granted when justice so requires," bearing in mind "the underlying purpose of Rule 15 to facilitate decision on the merits, rather than on the pleadings or technicalities." *Lopez v. Smith*, 203 F.3d 1122, 1127 (9th Cir. 2000) (en banc) (ellipses omitted). However, a court "may exercise its discretion to deny leave to amend due to 'undue delay, bad faith or dilatory motive on part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice

16

to the opposing party . . . , [and] futility of amendment.'" *Carvalho v. Equifax Info. Servs., LLC*, 629 F.3d 876, 892-93 (9th Cir. 2010) (alterations in original) (quoting *Foman v. Davis*, 371 U.S. 178, 182 (1962)).

## III.  DISCUSSION

The Court first turns to the task on remand from the Ninth Circuit, which is to analyze all four *Winter* factors for Plaintiff's first and second motions for a preliminary injunction. The procedural posture of this case on remand is complicated. As described in the procedural history section above, between Plaintiff's notices of appeal and the Ninth Circuit's disposition of those appeals, the Court dismissed Plaintiff's complaint, Plaintiff filed the FAC, Defendants filed a motion to dismiss the FAC, and Plaintiff filed a third preliminary injunction motion. It is thus unclear whether the Ninth Circuit's mandate requires the Court to re-analyze Plaintiff's first two preliminary injunction motions, which were both based on a complaint that the Court has since dismissed. *See Pac. Bell Tel. Co. v. Linkline Commc'ns, Inc.*, 555 U.S. 438, 456 n.4 (2009) ("Normally, an amended complaint supersedes the original complaint.").

Out of an abundance of caution, the Court analyzes both Plaintiff's first two preliminary injunction motions and the third preliminary injunction motion, for the following two reasons. First, only the Court's orders denying Plaintiff's first and second motions for a preliminary injunction were before the Ninth Circuit, which suggests that the Ninth Circuit's instructions on remand relate to the Court's consideration of those motions. Second, as explained in more detail in Section III.C below, the nature of the injunctive relief that Plaintiff seeks has changed between the first two preliminary injunction motions and the third preliminary injunction motion. Namely, in the first two motions Plaintiff sought a prohibitory injunction, in that he sought to prevent SCU from suspending or terminating Plaintiff. *See* ECF No. 14 at 1; ECF No. 39 at 1. Plaintiff filed his third preliminary injunction motion after SCU terminated Plaintiff's employment. As a result, the third motion seeks a mandatory injunction, in that it seeks Plaintiff's reinstatement. *See* ECF No. 145 at 1. The Ninth Circuit applies a higher standard to mandatory injunctions than to

United States District Court
Northern District of California

prohibitory injunctions. *See Hernandez v. Sessions*, 872 F.3d 976, 997-98 (9th Cir. 2017) (acknowledging criticisms of separate standards but concluding that circuit precedent requires the distinction). Thus, the Court concludes that it would be prejudicial to Plaintiff to interpret the Ninth Circuit's mandate as only applying to the third preliminary injunction motion, in which Plaintiff faces a heavier burden than he faced in the first two motions. In any event, even if the Court's interpretation of the Ninth Circuit's mandate is wrong, it would not make a difference, because the Court analyzes and denies all three preliminary injunction motions in this order.

The Court then addresses the motion to dismiss the FAC and then turns to Plaintiff's third motion for a preliminary injunction.

## A.     First and Second Motions for a Preliminary Injunction

As stated above, "[a] plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter*, 555 U.S. at 20. The party seeking the injunction bears the burden of proving these elements. *Klein*, 584 F.3d at 1201. "The Ninth Circuit weighs these factors on a sliding scale, such that where there are only 'serious questions going to the merits'—that is, less than a 'likelihood of success on the merits'—a preliminary injunction may still issue so long as 'the balance of hardships tips *sharply* in the plaintiff's favor' and the other two factors are satisfied." *Short*, --- F.3d ---, 2018 WL 3077070, at *3 (quoting *Shell Offshore*, 709 F.3d at 1291). "For the purposes of injunctive relief, 'serious question[s]' are 'questions which cannot be resolved one way or the other at the hearing on the injunction. . . . Serious questions need not promise a certainty of success, nor even present a probability of success, but must involve a fair chance of success on the merits.'" *TAP Mfg., LLC v. Signs*, 2015 WL 12762269, at *1 (C.D. Cal. Mar. 6, 2015) (quoting *Rep. of the Philippines v. Marcos*, 862 F.2d 1355, 1362 (9th Cir. 1988)); *see also Cascadia Wildlands v. Scott Timber Co.*, 715 F. App'x 621, 624-25 (9th Cir. 2017) (unpublished) (citing *Rep. of the Philippines* for definition of "serious questions").

In its memorandum disposition in this case, the Ninth Circuit observed that "in the employment discrimination context the likelihood of success on the merits may inform the irreparable harm analysis." ECF No. 135 at 5 (citing *Chalk v. U.S. Dist. Court Cent. Dist. of Cal.*, 840 F.2d 701, 704-10 (9th Cir. 1988)). Specifically, the Ninth Circuit suggested that if Plaintiff had a strong age discrimination claim, Plaintiff's harm might more likely be irreparable. *Id.* The Ninth Circuit then remanded for this Court to "complete a full analysis of the preliminary injunction factors to decide whether to issue a preliminary injunction." Accordingly, the Court first turns to Plaintiff's likelihood of success on the merits.

### 1. Likelihood of Success on the Merits

"The first factor under *Winter* is the most important—likely success on the merits." *Garcia v. Google, Inc.*, 786 F.3d 733, 740 (9th Cir. 2015) (en banc). Both Plaintiff's first and second preliminary injunction motions fail to carry Plaintiff's burden of establishing that Plaintiff is likely to succeed on the merits of his claims. In Plaintiff's first preliminary injunction motion, Plaintiff's analysis of the likelihood of success factor focused entirely on the alleged flaws in SCU's investigation of Doe's allegations and evidence that he contends shows Doe's allegations are false. *See* ECF No. 14 at 7-9, 11-13. For example, Plaintiff argued that "Plaintiff has presented serious questions, if not a strong likelihood of success, that the underlying investigation and process were fundamentally unfair." *Id.* at 12. Plaintiff appeared to assume that proving procedural flaws in the investigation equated to a likelihood of success in proving all of his claims. Plaintiff did not address the likelihood of success on any particular claim, nor did Plaintiff explain how his factual allegations about the flaws in the investigation related to the elements of any of his claims.

Plaintiff's analysis of the likelihood of success factor in the second preliminary injunction motion is similarly cursory. In Plaintiff's introduction to the second motion, Plaintiff cites some evidence in support of his contention that he did not sexually harass Doe, including friendly emails that Doe sent Plaintiff and Plaintiff's assertion that he took a lie detector test that proved he

did not harass Doe. ECF No. 39 at 1-14. Plaintiff argues that Doe's accusations are false and that as a result there was no extraordinary cause to fire him. ECF NO. 39 at 14. Presumably this argument relates to Plaintiff's contract claim. In addition, Plaintiff states:

> Professor Heineke can and will prove that he did not sexually harass Ms. [Doe] (or anyone else), that there is absolutely no merit to the fabricated (demonstrably implausible) accusation and that SCU has acted recklessly or purposely in seeking to terminate him, not because of any sexual harassment, but as a pretext to fire him because of his age in order to save over $100,000/year by terminating him and replacing him with a cheaper adjunct professor who is less qualified.

*Id.* at 15. The portion of Plaintiff's second preliminary injunction motion devoted to his likelihood of success on the merits states, in full: "With regard to the likelihood of success on the merits, as shown above, Ms. [Doe]'s accusation is false and fabricated and Professor Heineke will prove it." ECF No. 39 at 23.

Given the Ninth Circuit's admonition that "[a] preliminary injunction is 'an extraordinary and drastic remedy, one that should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion,'" *Lopez v. Brewer*, 680 F.3d 1068, 1072 (9th Cir. 2012) (quoting *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (per curiam)), such cursory analysis does not satisfy Plaintiff's burden. *Cf. Short v. Brown*, 2018 WL 1941762, at *10 (E.D. Cal. Apr. 25, 2018) ("It is not this Court's role to spin out arguments . . . that Plaintiffs have not made."), *aff'd*, 2018 WL 3077070 (9th Cir. June 22, 2018); *Dunn v. Codikow*, 2013 WL 12089494, at *2 (C.D. Cal. Oct. 21, 2013) (finding that allegation that contract was fraudulent and void, "without any citation to relevant case law or evidence, falls well short of meeting [the] burden to establish a substantial likelihood of success on the merits").

Nevertheless, because the Ninth Circuit highlighted the potential significance of Plaintiff's age discrimination allegations in its memorandum disposition, the Court independently assesses the strength of Plaintiff's age discrimination claim as presented in the operative complaint at the time of the first two preliminary injunction motions, even though Plaintiff did not brief his likelihood of success on his age discrimination claim in any detail in either preliminary injunction

20

motion. The Court previously considered the original complaint's purported ADEA claim in detail in the Court's December 5, 2017 order dismissing the original complaint. This analysis is recounted in detail in the procedural background section, above, and so the Court need not repeat all of that analysis again here. In brief, the Court noted that it was unclear whether Plaintiff had pleaded a standalone ADEA claim at all. ECF No. 99 at 36. To the extent that Plaintiff attempted to plead an ADEA claim, the Court determined that Plaintiff had failed to allege a prima facie case because Plaintiff did not allege that he was replaced by a significantly younger professor. *Id.* at 36-39. The Court also concluded that Plaintiff's allegation that SCU fired him in order to cut costs—an allegation that Plaintiff repeated in his first and second preliminary injunction motions, *see* ECF No. 14 at 15, ECF No. 39 at 15—meant that any ADEA claim failed. ECF No. 99 at 37-40. The Court explained that under U.S. Supreme Court and Ninth Circuit precedent, a termination motivated by a factor other than age did not violate the ADEA. *Id.* (citing *Hazen Paper Co.*, 507 U.S. at 608, 611 ("there is no disparate treatment under the ADEA when the factor motivating the employer is some feature other than the employee's age"); *Turney*, 92 F.3d 1194 (finding that ADEA claim failed where "the motivating factor for terminating Turney appears to be one which is related to, but not the same as, his age"); *Flynn*, 958 F.2d 377 ("A desire to cut costs does not necessarily equate with an intent to discriminate on the basis of age . . . .")); *see also Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 176 (2009) (stating that a "plaintiff must prove by a preponderance of the evidence (which may be direct or circumstantial), that age was the 'but-for' cause of the challenged employment decision"); *E.E.O.C. v. Timeless Investments, Inc.*, 734 F. Supp. 2d 1035, 1062 (E.D. Cal. 2010) ("Under 'but-for' causation, a plaintiff must show that age was 'the reason' for the adverse employment action; there is no ADEA liability for 'mixed motive' employment actions."). Accordingly, as the Court's dismissal for failure to state a claim shows, Plaintiff was not likely to succeed on the merits of any age discrimination claim pled in the original complaint, nor had Plaintiff established serious questions going to the merits of such a claim.

21

Plaintiff also failed to show that he was likely to succeed on his § 1983 cause of action. As the Court explained in the procedural history section above, Plaintiff failed to establish state action, which is required to state a § 1983 claim. *See* ECF No. 99 at 27-33. Accordingly, the Court dismissed Plaintiff's § 1983 claim. The Court also struck several of Plaintiff's claims pursuant to California's anti-SLAPP statute. The Court then declined to exercise supplemental jurisdiction over and thus dismissed Plaintiff's remaining state law causes of action. In similar circumstances, where a court has dismissed the entire complaint, this Court and other courts in the Ninth Circuit have found that the plaintiff has failed to establish likelihood of success on the merits. *See, e.g.*, *Prager Univ. v. Google LLC*, 2018 WL 1471939, at *14 (N.D. Cal. Mar. 26, 2018); *Physician's Surrogacy, Inc. v. German*, 2017 WL 3622329, at *12 (S.D. Cal. Aug. 23, 2017). Accordingly, the Court finds that Plaintiff did not establish a likelihood of success on the merits or serious questions going to the merits in either the first or second preliminary injunction motions.

### 2. Irreparable Harm

In *Sampson v. Murray*, 415 U.S. 61 (1974), the U.S. Supreme Court considered a case in which a federal employee sought to enjoin her dismissal pending resolution of her administrative appeal. *Id.* at 63. The employee argued that, absent an injunction, she would be irreparably harmed because "spurious and unrebutted charges against her might remain on the record" and "she would suffer the embarrassment of being wrongfully discharged in the presence of her coworkers." *Id.* at 89. The federal employee also argued that she would be irreparably harmed because she would be denied an income. *Id.* The D.C. Circuit "intimated that either loss of earnings or damage to reputation might afford a basis for finding irreparable injury," but the U.S. Supreme Court disagreed, saying that a showing of lost earnings and reputational harm "falls far short of the type of irreparable injury which is a necessary predicate to the issuance of a temporary injunction." *Id.* at 91-92. In a footnote, the U.S. Supreme Court observed:

> We recognize that cases may arise in which the circumstances surrounding an
> employee's discharge, together with the resultant effect on the employee, may so

22

far depart from the normal situation that irreparable injury might be found.  Such extraordinary cases are hard to define in advance of their occurrence.  We have held that an insufficiency of savings or difficulties in immediately obtaining other employment—external factors common to most discharged employees and not attributable to any unusual actions relating to the discharge itself—will not support a finding of irreparable injury, however severely they may affect a particular individual.  But we do not wish to be understood as foreclosing relief in the genuinely extraordinary situation.

*Id.* at 93 n.68.  In the instant case, the Ninth Circuit clarified that *Sampson* does not "create a per se rule for all employment cases—that reputational damage, lost opportunity, and emotional distress caused by a suspension or termination cannot constitute irreparable harm."  ECF No. 135 at 4.

Nevertheless, applying *Sampson*, the Ninth Circuit has rejected assertions of irreparable harm stemming from lost income, reputational damage, and psychological injury.  In *Hartikka v. United States*, 754 F.2d 1516 (9th Cir. 1985), the Ninth Circuit held that lost income, lost retirement and relocation pay, and damage to a military service member's reputation resulting from the stigma of a less-than-honorable discharge did not constitute irreparable harm.  *Id.* at 1518.  Similarly, in *Kennedy v. Secretary of Army*, 191 F.3d 460 (9th Cir. 1999) (unpublished table decision), the Ninth Circuit held that lost military benefits, damage to the service member's reputation, and damage to his mental health would not support a finding of irreparable harm.  *Id.* at *2.

Plaintiff attempts to distinguish *Hartikka* and *Kennedy* based on the requirement that a party challenging a military discharge must "make a much stronger showing of irreparable harm than the ordinary standard for injunctive relief."  PI Mot. at 19-20; *Kennedy*, 191 F.3d 460 at *2.  However, both *Hartikka* and *Kennedy* show that what the Ninth Circuit described as a "higher burden" in those cases is actually consistent both with *Sampson*, which concerned civilian employees, and with current law on irreparable harm.  Specifically, in *Hartikka*, the Ninth Circuit viewed *Sampson* as requiring a higher showing of irreparable harm than the standard preliminary injunction requirement, which at that time only required a "possibility of irreparable injury" if combined with a likelihood of success on the merits.  *See Hartikka*, 754 F.2d at 1518.  Of course,

23

the U.S. Supreme Court in *Winter* required a showing that irreparable harm was likely, not just possible, 555 U.S. at 22, which means that the distinction drawn in *Hartikka* is no longer meaningful. In any event, the standard in *Hartikka* and *Kennedy* is not a higher one than *Sampson* because the Ninth Circuit in *Hartikka* explicitly applied the irreparable harm standard from *Sampson*, which covered civilian employees, to military employees. 754 F.3d 1518 ("While we realize that the rule in *Sampson* concerned the rights of civilian employees, we agree that it should also be applied to military personnel."). Thus, the "higher burden" on military personnel was not actually dispositive in either *Hartikka* or *Kennedy*. *Hartikka* found the allegations of irreparable harm failed under *Sampson*, which is not specific to the military. *Hartikka*, 754 F.2d at 1518 ("Our review leads us to conclude that these alleged injuries are insufficient under the Sampson standard to justify injunctive relief."). *Kennedy*, in turn, relied entirely on *Hartikka*'s discussion of *Sampson*. *Kennedy*, 191 F.3d 460 at *2. Thus, the fact that the plaintiffs in *Hartikka* and *Kennedy* were challenging military discharges does not meaningfully distinguish those cases from the instant case.

In any event, in *Chalk v. U.S. District Court for the Central District of California*, 840 F.2d 701 (9th Cir. 1988), the Ninth Circuit held that an HIV-positive teacher who was removed from the classroom had demonstrated that he was likely to succeed on his Rehabilitation Act claim. *Id.* at 704-09. Citing to district court discrimination cases that considered whether emotional distress constitutes irreparable harm,[2] the Ninth Circuit then held that the teacher's loss of job satisfaction and "psychological and physiological distress," *id.* at 709, established a possibility of irreparable harm.[3] *Id.* at 709-10. The Ninth Circuit also stressed in *Chalk* that because of the teacher's diagnosis, "[a] delay, even if only a few months, pending trial represents precious, productive time irretrievably lost to him." *Id.* at 710. In its decision in the instant case, the Ninth Circuit characterized *Chalk* as standing for the principle that, where a plaintiff has

---

[2] *Chalk* does not cite or mention the U.S. Supreme Court's decision in *Sampson*.
[3] *Chalk* was decided before the U.S. Supreme Court's decision in *Winter*, which required that a plaintiff show that irreparable harm is likely, not just possible. *See Winter*, 555 U.S. at 22.

24

established a likelihood of success on the merits of a discrimination claim, "the injuries of reputational harm, loss of opportunity, and emotional distress resulting from that (likely provable) discrimination were the type of non-compensable injury the law was designed to prevent." ECF No. 135 at 5; *see also Stanley v. Univ. of S. Cal.*, 13 F.3d 1313, 1324 n.5 (9th Cir. 1994) (noting in dicta that there is legal support for the district court's conclusion that "allegations of intentional sex discrimination, prospective loss of reputation, business opportunity, and serious emotional distress" could constitute irreparable harm). The Ninth Circuit thus observed in the instant case that *Chalk* "suggests that in the employment discrimination context the likelihood of success on the merits may inform the irreparable harm analysis." *Id.*

Here, as discussed above, Plaintiff did not establish in his first or second preliminary injunction motion that he was likely to succeed on the merits of his claims, including any age discrimination claim. Accordingly, to the extent that a likelihood of success on the merits of a discrimination claim is what distinguishes the harm in *Sampson*, *Hartikka*, and *Kennedy*, which is not irreparable, from the harm in *Chalk*, which is irreparable, the Court finds that Plaintiff's case is closer to *Sampson*, *Hartikka*, and *Kennedy* because Plaintiff did not establish a likelihood of success on his age discrimination claim in the first two preliminary injunction motions.

It is not clear from *Chalk*, *Stanley*, or the Ninth Circuit's decision in the instant case whether Plaintiff's alleged harms of emotional distress, reputational damage, and lost opportunity to teach, in the absence of discrimination, qualify as irreparable harm. The Court recognizes that *Sampson* did not create a per se rule that a similar combination of harms could never constitute irreparable harm, but the Court also doubts that the opposite per se rule exists. *Sampson* and the range of persuasive district and out-of-circuit appeals court decisions that the Court cited in its September 15, 2017 order denying the first preliminary injunction motion suggest that in the majority of cases, emotional distress and reputational harm due to adverse employment decisions, at least in the absence of discrimination, will not constitute irreparable harm. *See Sampson*, 415 U.S. at 91-93 & n.68; ECF No. 22 at 6-7 (collecting cases).

25

In the instant case, because Plaintiff failed to establish even serious questions going to the merits of his discrimination claim, the Court finds that Plaintiff has not shown that this is the type of "generally extraordinary situation" case where an adverse employment action is likely to cause irreparable harm. *See Sampson*, 415 U.S. at 93 n.68; ECF No. 135 at 5 (Ninth Circuit suggesting in its memorandum disposition in the instant case "that in the employment discrimination context the likelihood of success on the merits may inform the irreparable harm analysis").

### 3. Balance of Equities

"To obtain a preliminary injunction, a plaintiff must also demonstrate that 'the balance of equities tips in his favor.'" *Hernandez*, 872 F.3d at 995 (quoting *Winter*, 555 U.S. at 20). In Plaintiff's first preliminary injunction motion, Plaintiff argued that "there will be no harm" to SCU by an injunction allowing Plaintiff to continue teaching. ECF No. 14 at 15. Specifically, Plaintiff contended that "even if the Court were to ultimately deny the merits of Professor Heineke's claims of wrongful termination[,] [SCU] would simply suspend and/or terminate Professor [*sic*] at a later time for cause as determined by a full and fair trial on the merits." *Id.* at 15. By contrast, Plaintiff argued that his suspension before the internal appeals process completes and the instant case concludes is a "bell [that] cannot be unrung." *Id.* Plaintiff makes substantially similar arguments in his second preliminary injunction motion. ECF No. 39 at 23-24. Plaintiff adds that in the absence of an injunction, his students would "be deprived of his excellent teaching and mentoring" and his colleagues would "be deprived of his intellect and friendship." *Id.* at 23. Thus, the implication of Plaintiff's argument is that his emotional distress and reputational damage outweigh the lack of harm that SCU would suffer as a result of an injunction.

SCU responds that an injunction would be "far more likely to cause substantial harm to SCU." ECF No. 17 at 21; ECF No. 47 at 22. Specifically, SCU argues that "the reason SCU suspended Plaintiff is because an independent investigator concluded he sexually harassed a student in violation of SCU's policies and federal and state law." *Id.* "To permit a faculty member to return to teaching after a finding of such seriously egregious conduct would not only

Case No. 17-CV-05285-LHK
ORDER DENYING MOTIONS FOR PRELIMINARY INJUNCTION, GRANTING MOTION TO DISMISS, AND
GRANTING MOTION TO STRIKE SUR-OPPOSITION

signal to SCU's students and faculty that SCU tolerates such conduct, but it would also leave other students exposed to a professor who was found to harass his student and could potentially harass other students." SCU adds that SCU has already made arrangements to have another faculty member cover Plaintiff's courses and changing plans will cost SCU money and will inconvenience the students and faculty. *Id.*

Plaintiff overreaches in contending that an injunction would cause no harm to SCU. The Sixth Circuit has acknowledged that "[a] college's or university's interest in maintaining a hostile-free learning environment . . . is well recognized." *Bonnell v. Lorenzo*, 241 F.3d 800, 822 (6th Cir. 2001). Particularly where, as here, Plaintiff has not shown that he is likely to prevail on his claim that his suspension was discriminatory, the Court's intervention into SCU's internal disciplinary process before SCU's process had run its full course would harm the credibility of that process. Moreover, ordering Plaintiff's return to the classroom would unduly interfere in a university's judgment about how best to protect the safety of its students. Such an intervention also would likely cause victims of sexual misconduct—be they students, staff, or faculty—to question whether SCU would take any meaningful action in response to future complaints. Finally, to the extent that SCU is correct that Plaintiff sexually harassed Doe, ordering Plaintiff's return to the classroom would put other students at risk. *Cf. Singh v. School Dist. of Phila.*, 2010 WL 3220336, at *13 (E.D. Pa. Aug. 11, 2010) ("The harm to Singh is outweighed by the risk of placing a teacher with violations of school policy back in Kensington CAPA's learning environment.").

On the other hand, in the absence of an injunction, Plaintiff would likely continue to suffer emotional distress, reputational harm, and also would be deprived, at least temporarily, of the opportunity to continue teaching. To the extent that Plaintiff is correct that he did not sexually harass Doe, such harms will occur despite Plaintiff's innocence. However, the Court again notes that Plaintiff failed to establish a likelihood of success on the merits of his claims.

Although in *Chalk* the Ninth Circuit held that the teacher's injury outweighed any

United States District Court
Northern District of California

theoretical risk to students posed by the teacher's return to the classroom, *Chalk* is distinguishable from the instant case. The plaintiff in *Chalk* had established a strong possibility of success on the merits of a discrimination claim, which Plaintiff has failed to do here. In addition, the potential harm to students in *Chalk*, which was decided in the 1980s, was largely based on fears and misunderstandings about the transmission of AIDS, and there was no evidence of any significant risk to the students. *See* 840 F.2d at 705-08, 710-11. In the instant case, by contrast, an independent investigator issued more than 100 pages of reports that included a review of emails and witness testimony in support of his finding that Plaintiff harassed Doe. At least one level of review affirmed these findings by the time Plaintiff filed his first two preliminary injunction motions.

Weighing SCU's potential harm from an injunction against Plaintiff's potential harm in the absence of an injunction, the Court finds that the balance of equities favors SCU.

### 4. Public Interest

"When, as here, 'the impact of an injunction reaches beyond the parties, carrying with it a potential for public consequences, the public interest will be relevant to whether the district court grants the preliminary injunction.'" *Hernandez*, 872 F.3d at 996 (quoting *Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1139 (9th Cir. 2009)). Plaintiff argues in his first preliminary injunction motion that the public interest is best served "when citizens are able to petition the courts to seek redress of their grievances and the courts are able to effectively redress them if the merits are proven." ECF No. 14 at 15. Plaintiff argues in his second preliminary injunction motion that "the public interest strongly favors a trial on the merits before a person can be stripped of his career." ECF No. 39 at 24. Plaintiff also concedes that the public has an interest in preventing sexual harassment on campus, but Plaintiff argues that "it is also in the public's interest to have full due process and a full and fair trial to determine if actual sexual harassment occurred before someone is irreparably harmed by a false accusation." *Id.*

SCU responds that its suspension of Plaintiff, who was found to have harassed a student,

United States District Court
Northern District of California

"is consistent with the public interest in addressing sexual harassment on campus." ECF No. 17 at 21. SCU also argues that SCU "followed federal and state law and its own policies in disciplining a faculty member who was found to have harassed a student," which makes Plaintiff's suspension in the public interest. ECF No. 47 at 23.

Plaintiff's argument highlights a theme upon which he has focused throughout the proceedings in the instant case: that SCU should not be permitted to terminate or even suspend Plaintiff unless it can prove in court that he harassed Doe. *See* ECF No. 1 ¶¶ 49, 53, 55; ECF No. 14 at 15; ECF No. 39 at 24. Such a requirement is not the law, nor is it even necessarily in the public interest. Cases in a busy district such as the Northern District of California take years to resolve, at great expense to the parties and the courts. Requiring a private employer such as SCU to prove misconduct in court before terminating or even suspending an employee would go far beyond what constitutional due process requires, would hamstring private entities' ability to make personnel decisions, and would flood the courts. *See Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 542-46 (1985) (constitutional due process requires notice and an opportunity to respond before termination from a job in which employee has a property interest, but "the pretermination hearing need not definitively resolve the propriety of the discharge").

Taking a less extreme version of Plaintiff's argument, the Court recognizes that the "public has an interest in assuring that private institutions comport with general notions of procedural fair play." *See Ben-Yonatan v. Concordia College Corp.*, 863 F. Supp. 983, 988 (D. Minn. 1994); *see also Doe v. George Washington Univ.*, --- F. Supp. 3d ---, 2018 WL 1972461, at *7 (D.D.C. Apr. 25, 2018) (recognizing public interest in fairness in university disciplinary proceedings). However, the public also has an interest in preventing sexual harassment and in allowing private entities to make personnel decisions, so long as those personnel decisions do not violate the law. *See Doe*, 2018 WL 1972461 at *7 (recognizing public interest in university's ability to independently investigate and discipline students for misconduct); *Marshall v. Ohio Univ.*, 2015 WL 1179955, at *10 (S.D. Ohio Mar. 13, 2015) (observing that, absent a showing of likely

29

United States District Court
Northern District of California

success on the merits, the court is reluctant to interfere with disciplinary processes); *Ben-Yonatan*, 863 F. Supp. at 988 (recognizing public interest in harassment-free educational environment). Here, where Plaintiff has not shown a likelihood of success on the merits of his claims, the Court finds that an injunction would not be in the public interest.

### 5. Conclusion

After analyzing all four *Winter* factors with respect to Plaintiff's first and second preliminary injunction motions, the Court finds that Plaintiff failed to establish the "irreducible minimum for obtaining a preliminary injunction," *Stanley*, 13 F.3d at 1326, which is a likelihood of success on the merits or serious questions going to the merits. In addition, the Court finds that Plaintiff has failed to establish irreparable harm, that the balance of equities favors SCU, and that an injunction would not be in the public interest. Thus, Plaintiff has not carried his burden to establish that he is entitled to the extraordinary remedy of a preliminary injunction. Plaintiff's first and second motions for a preliminary injunction are thus DENIED.

The Court next addresses Defendants' motion to dismiss the FAC because the motion to dismiss analysis will inform the Court's analysis of the likelihood of success on the merits of the third preliminary injunction motion.

## B. Motion to Dismiss FAC

The Court first addresses the federal causes of action. The Court then addresses the state causes of action.

### 1. Plaintiff's § 1983 Cause of Action Fails for Lack of State Action

"To state a claim for relief in an action brought under § 1983, [a plaintiff] must establish that [he] w[as] deprived of a right secured by the Constitution or laws of the United States, and that the alleged deprivation was committed under color of state law." *Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 49-50 (1999). "Like the state-action requirement of the Fourteenth Amendment, the under-color-of-state-law element of § 1983 excludes from its reach 'merely private conduct, no matter how discriminatory or wrongful.'" *Id.* at 50 (quoting *Blum v. Yaretsky*,

30

Thus, "[i]n order to recover under § 1983 for conduct by the defendant, a plaintiff must show 'that the conduct allegedly causing the deprivation of a federal right must be fairly attributable to the State." *Caviness v. Horizon Community Learning Center, Inc.*, 590 F.3d 806, 812 (9th Cir. 2010) (quoting *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 937 (1982)).

"When addressing whether a private party acted under color of law, [the Court] therefore start[s] with the presumption that private conduct does not constitute governmental action." *See Sutton v. Providence St. Joseph Med. Center*, 192 F.3d 826, 835 (9th Cir. 1999). "Courts have used four different factors or tests to identify" when the presumption of private action is overcome and the private action can be attributed to the state: "(1) public function, (2) joint action, (3) governmental compulsion or coercion, and (4) governmental nexus." *Id.* at 835-36; *see also Abordo v. Mobi PCS*, 684 F. App'x 631, 632 (9th Cir. 2017) (unpublished) (citing *Sutton*'s explanation of the four tests).

Plaintiff appears to rely on governmental coercion and/or joint action as the basis for state action here. *See* FAC ¶ 5 ("These federal funding requirements and restrictions and penalties are designed to and, in fact, do require SCU to act in fact and in reality as an enforcement arm of the federal government to carry out enforcement of these federal and state anti-discrimination laws by coercing SCU . . . ."); MTD Opp'n at 9 ("Plaintiff has also alleged that Defendant SCU is required and was coerced by the federal and (State of California) [*sic*] to enforce both federal and state anti-discrimination (as to age and sexual harassment) laws as a condition of obtaining federal grant funds and that Defendant SCU is forced to enforce on behalf of federal and state government laws making it a 'partner' with the government in enforcing these laws." (citation omitted)). Specifically, Plaintiff argues that the federal and state governments coerce SCU into enforcing anti-discrimination and anti-sexual harassment laws by conditioning funds on enforcement of these laws. MTD Opp'n at 8-12. Plaintiff asserts that SCU then used its obligation to enforce anti-sexual harassment laws as a pretext for discriminating against Plaintiff based on his age. *Id.*

31

Plaintiff's theory of state action fails for several reasons. First, as the Court previously explained, neither the receipt of federal funds nor "governmental compulsion in the simple form of a generally applicable statutory requirement, without more," transforms a private actor into a state actor for the purpose of § 1983. *Sutton*, 192 F.3d at 837; *see* ECF No. 99 at 29-32 (citing *S.F. Arts & Athletics, Inc. v. U.S. Olympic Committee*, 483 U.S. 522, 544 (1987); *Rendell-Baker v. Kohn*, 457 U.S. 830, 840 (1982); *Caviness*, 590 F.3d at 808-09, 818; *Sutton*, 192 F.3d at 837-39).

Second, Plaintiff's attempt to frame the relationship between SCU and the federal and state governments as compulsion or joint action fails under Ninth Circuit precedent. In *Sutton*, the Ninth Circuit offered a detailed explanation of the evolution of the concept of compulsion in the state action context. 192 F.3d at 838-43. The Ninth Circuit explained that "[i]n the typical case raising a state-action issue, a private party has taken the decisive step that caused the harm to the plaintiff, and the question is whether the State was sufficiently involved to treat that decisive conduct as state action." *Id.* at 838 (quoting *Nat'l Collegiate Athletic Ass'n v. Tarkanian*, 488 U.S. 179, 192 (1988)). The Ninth Circuit then traced the applicability of the concept of compulsion through cases in which the government was held accountable for the actions of a private party and cases in which a private party was held accountable as a state actor. *Id.* at 836-39.

The Ninth Circuit concluded that "in each of the Supreme Court's private-defendant cases, there was some additional nexus [beyond the application of a general statute] that made it fair to deem the private entity a governmental actor in the circumstances." *Id.* at 839 (citing *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 941-42 (1982); *Moose Lodge No. 107 v. Irvis*, 407 U.S. 163, 177 (1972); *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 149 (1970)). The Ninth Circuit explained that "[t]ypically, the nexus has consisted of participation by the state in an action ostensibly taken by the private entity, through conspiratorial agreement (*Adickes*), official cooperation with the private entity to achieve the private entity's goal (*Lugar*), or enforcement and ratification of the private entity's chosen action (*Moose Lodge*)." *Id.* at 841.

In *Sutton*, the Ninth Circuit also distinguished *Carlin Communications, Inc. v. Mountain States Tel. & Tel. Co.*, 827 F.2d 1291 (9th Cir. 1987), which Plaintiff cites in the instant case for the proposition that a private party can be a state actor. *See* MTD Opp'n at 9. In *Carlin*, "the plaintiff operated a '976' number that allegedly distributed sexually explicit materials to minors, in violation of state law. An Arizona deputy district attorney told the defendant, a telephone company, to terminate the plaintiff's service. The deputy district attorney threatened to prosecute the company if it did not comply." *Sutton*, 192 F.3d at 843 (citations omitted) (citing *Carlin*, 827 F.2d at 1293, 1295). The Ninth Circuit explained that in *Carlin*, "the government directed a specific entity to take a specific (allegedly unconstitutional) action against a specific person. . . . We do not read *Carlin* as applying to cases such as this, which involve only generally applicable laws." *Sutton*, 192 F.3d at 843 (citation omitted).

Here, the Court previously observed that "Plaintiff does not contend that it was the mere fact that SCU conducted an investigation, as required by law, that deprived him of due process. Nor does Plaintiff allege that any state or federal law, including Title IX, compelled SCU to conduct the investigation in a certain way or come to any particular decision about his termination." ECF No. 99 at 31. Plaintiff also does not contend that either the federal or state government helped SCU with its investigation, conspired with SCU to investigate and terminate Plaintiff, or enforced or ratified SCU's decision to terminate Plaintiff. *See Sutton*, 192 F.3d at 841; *see also Logan v. Bennington Coll. Corp.*, 72 F.3d 1017, 1028 (2d Cir. 1995) (finding no state action where the state "neither drafted the disciplinary code, nor participated in determining what sentence was to be handed out under it); *Doe v. Washington & Lee Univ.*, 2015 WL 4647996, at *9 (W.D. Va. Aug. 5, 2015) (rejecting argument that university was a state actor where the plaintiff did not allege that the government participated in the decisionmaking process or deprived university of its autonomy to investigate and adjudicate charges).

To the contrary, Plaintiff argues that SCU used its federally and state-mandated anti-sexual harassment policies and process as a pretext to violate Plaintiff's rights. *See* MTD Opp'n at 9. In

33

United States District Court
Northern District of California

Case No. 17-CV-05285-LHK
ORDER DENYING MOTIONS FOR PRELIMINARY INJUNCTION, GRANTING MOTION TO DISMISS, AND
GRANTING MOTION TO STRIKE SUR-OPPOSITION

other words, SCU was required by "a generally applicable statutory requirement" to have policies to address sexual harassment, and Plaintiff alleges that SCU "abused" this requirement as a pretext to discriminate against him. *Id.* at 11. Under *Sutton*, such allegations are not sufficient to establish state action through compulsion because the government was not involved in SCU's allegedly wrongful conduct. *See Sutton*, 192 F.3d at 841; *see also Collins v. Womancare*, 878 F.2d 1145, 1152 (9th Cir. 1989) ("[A]n allegation that *private* parties misused a Virginia attachment procedure could not state a claim under section 1983 because such private parties could not be considered acting under color of state law." (citing *Lugar*, 457 U.S. at 940)).

Third, as the Court previously explained, other courts that have considered variations of Plaintiff's state action theory—that receipt of federal funding and/or compliance with Title IX makes a private school a state actor—have rejected it. *See* ECF No. 99 at 29-30, 32 (citing *Caviness*, 590 F.3d at 808-09, 818; *Faparusi v. Case W. Reserve Univ.*, 711 F. App'x 269, 275-76 (6th Cir. Oct. 4, 2017) (unpublished); *Doe v. Case W. Reserve Univ.*, No. 1:17 CV 414, 2017 WL 3840418, at *9 (N.D. Ohio Sept. 1, 2017); *Gross v. R.T. Reynolds, Inc.*, 487 F. App'x 711, 719 (3d Cir. 2012) (unpublished); *Grosvenor v. Des Moines Area Community College*, 980 F.2d 734, at *2 (8th Cir. 1992) (unpublished)). Indeed, the Court has identified additional cases that come to the same conclusion. *See, e.g.*, *Doe v. Univ. of Denver*, 2018 WL 1304530, at *6-7 (D. Col. Mar. 13, 2018); *Rossley v. Drake Univ.*, 2017 WL 5634151, at *3 (S.D. Iowa Sept. 6, 2017); *Tsuruta v. Augustana Univ.*, 2015 WL 5838602, at *2 (D.S.D. Oct. 7, 2015); *Armstrong v. Wilson*, 942 F. Supp. 1252, 1262 (N.D. Cal. 1996); *cf. Stilwell v. City of Williams*, 831 F.3d 1234, 1243 (9th Cir. 2016) (describing distinction that the U.S. Supreme Court drew in *Fitzgerald v. Barnstable School Committee*, 555 U.S. 246 (2009), between a Title IX claim, which can be brought against a private institution, and a § 1983 claim, which "reaches only state actors"). In response, Plaintiff attempts to distinguish *Caviness* and *Faparusi* by arguing that the state action allegations in those cases differed from Plaintiff's allegations, *see* MTD Opp'n at 10, but Plaintiff does not address any of the other cases that have rejected his theory, nor does Plaintiff cite any authority that affirmatively

34

supports his position that receipt of federal funding and compliance with Title IX makes SCU a state actor. As such, Plaintiff has not persuaded the Court that its previous ruling should change.

Finally, Plaintiff again argues that it is not appropriate to decide state action at the motion to dismiss stage because state action is a "highly factual determination." *Id.* at 8. The Court previously considered and rejected this argument. ECF No. 99 at 28-29. Moreover, where Plaintiff's theory of state action fails as a matter of law and Plaintiff has not identified what additional facts he hopes to discover that would make a difference to the Court's analysis, the Court finds that dismissing the § 1983 claim at the motion to dismiss stage is appropriate. *See generally Price v. Hawaii*, 939 F.2d 702, 707-08 (9th Cir. 1991) (affirming dismissal of § 1983 claim at pleading stage). The motion to dismiss the § 1983 claim is thus GRANTED with prejudice because Plaintiff failed to cure the deficiencies previously identified by the Court and amendment would be futile. *See Carvalho*, 629 F.3d at 892-93.

### 2. The FAC Fails to Separately State an ADEA Claim

Federal Rule of Civil Procedure 10(b) provides that "[i]f doing so would promote clarity, each claim founded on a separate transaction or occurrence . . . must be stated in a separate count." "Separate counts will be required if necessary to enable the defendant to frame a responsive pleading or to enable the court and the other parties to understand the claims." *Bautista v. Los Angeles County*, 216 F.3d 837, 840 (9th Cir. 2000) (quoting JAMES WM. MOORE, ET AL., MOORE'S FEDERAL PRACTICE, § 10.03[2][a] (3d ed. 1997)). Courts in this district and other courts in the Ninth Circuit routinely require plaintiffs to state each claim separately. *See, e.g.*, *Washington v. Alameda County*, 2018 WL 707522, at *2 (N.D. Cal. Feb. 5, 2018) (requiring plaintiff to allege claims separately in amended complaint and stating that "The Court will only consider claims that are clearly identified as such in the complaint."); *Rivera v. East Bay Municipal Utility Dist.*, No. C 15-380-SBA, 2015 WL 6954988, at *9 n.12 (N.D. Cal. Nov. 10, 2015) (requiring plaintiff to allege discrimination and retaliation claims as separate claims for relief in amended complaint); *Cuviello v. Feld Entm't, Inc.*, No. 13-CV-3135-LHK, 2014 WL 1379849, at *4-5 (N.D. Cal. Apr.

35

7, 2014) (dismissing cause of action that combined assault and battery claims); *Magallon v. Ventura County Sheriff's Dep't*, No. CV 11-7053-CAS, 2011 WL 4481288, at *2 (C.D. Cal. Sept. 27, 2011) ("The preferred practice of pleading is to state various claims for relief in separate counts.").

Here, in the December 5, 2017 order dismissing the original complaint, the Court stated that "it is not even clear that Plaintiff has attempted to allege an ADEA claim. The caption of the Complaint lists the second cause of action as 'ADEA Violations (29 U.S.C. § 631 et seq.)' and the Complaint invokes federal jurisdiction based in part on the ADEA. *See* Compl. ¶ 1. However, the body of the Complaint does not contain an ADEA cause of action. Rather, the body of the Complaint only contains a wrongful discharge cause of action that mentions age discrimination in passing. *See* Compl. ¶¶ 57-61." ECF No. 99 at 36. The Court nevertheless analyzed the deficiencies in Plaintiff's age discrimination allegations so that Plaintiff would have the opportunity to cure the deficiencies if he chose to plead an ADEA violation in an amended complaint. *Id.* at 36-40. The Court then dismissed "the ADEA cause of action, to the extent that the Complaint pleads one." *Id.* at 39-40.

Despite being on notice that the complaint did not clearly state an ADEA cause of action, Plaintiff's FAC fails to remedy this deficiency. Just as he did in the original complaint, Plaintiff lists "ADEA Violations (29 U.S.C. § 631 et seq.)" in the caption of the FAC but fails to plead an ADEA cause of action in the body. *See* FAC ¶¶ 50-93. Instead, Plaintiff once again pleads a state law wrongful discharge claim, enumerated as "Count Two." *Id.* ¶¶ 57-64; *see Rains v. Criterion Sys., Inc.*, 80 F.3d 339, 343 (9th Cir. 1996) ("It is state, not federal, law that creates the cause of action for wrongful discharge in violation of public policy."). "In order to prevail on such a claim under California law, a plaintiff must prove as one element that a fundamental public policy exists that is 'delineated in constitutional or statutory provisions.'" *Rains*, 80 F.3d at 343 (quoting *Gantt v. Sentry Ins.*, 824 P.2d 680, 687-88 (Cal. 1992)) (ellipses omitted). Here, Plaintiff's wrongful discharge claim is based on multiple possible public policy violations: SCU's alleged violation of

Plaintiff's employment contract with SCU (¶ 58); SCU's alleged violation of its own investigation

policies (¶¶ 58, 60); SCU's alleged violation of the California Fair Employment and Housing Act

("CFEHA"), Cal. Gov. Code § 12940(a) (¶ 61); and SCU's alleged violation of the ADEA, 29

U.S.C. § 621 et seq. (¶ 61).

Defendants argue that it is thus unclear whether Plaintiff intends to assert an ADEA claim

at all. MTD at 12; Reply at 8-9. Indeed, Plaintiff contradicts himself when describing the claim,

in that Plaintiff refers to Count Two both as a "wrongful termination/ADEA" claim and as a

"FEHA related non-statutory claim for wrongful termination based upon age discrimination."

MTD Opp'n at 3:10-11, 5:18-19. Similarly, when the Court asked Plaintiff's counsel at the April

18, 2018 case management conference whether Count Two was intended to be a wrongful

discharge claim or an ADEA claim, Plaintiff's counsel responded that it was "both." April 18,

2018 Tr. at 15:15-25. Allowing such ambiguous pleading would force Defendants and the Court

to guess about the nature of the claim and whether the claim should be evaluated under state or

federal law. Such ambiguous pleading also would frustrate the purpose of Rule 10(b), which

requires the parties to plead separate claims in order "to frame the issue and provide the basis for

informed pretrial proceedings." *Bautista*, 216 F.3d at 841.

The Court finds that Count Two is most fairly read as a state law claim for wrongful

discharge. First, although not dispositive, the title of the claim is "wrongful discharge," not

"ADEA Violation." *See Rains*, 80 F.3d at 343 & n.2 (noting that a wrongful termination claim

exists in California law, not federal law, but observing that the label of a cause of action is not

alone determinative). Plaintiff chose to retain this title for this claim even after the Court placed

Plaintiff on notice that the previous "wrongful discharge" claim did not clearly plead an ADEA

claim. *See id.* at 344; *cf. Bautista*, 216 F.3d at 844-45 (O'Scannlain, J., concurring in part and

dissenting in part) (observing that "[w]hen parties fail to plead their claims with sufficient

specificity, the district court is under no obligation to redraft the pleadings for them," particularly

where the parties "are represented by experienced counsel duly admitted to practice in the federal

37

courts").

Second, the way that the wrongful discharge claim is pled shows that the claim is better construed as a wrongful discharge claim than an ADEA claim. Specifically, a wrongful discharge claim can be based on age discrimination, but it can also be based on other violations of public policy. *See Hawkins v. SimplexGrinnell, L.P.*, 640 F. App'x 640, 644 (9th Cir. 2016) (unpublished) ("Under California law, termination motivated by age discrimination can also give rise to a *Tameny* claim."); *Rains*, 80 F.3d at 343-44 (discussing wrongful discharge claim based on religious discrimination); *Tameny v. Atlantic Richfield Co.*, 610 P.2d 1330, 1331 (Cal. 1980) (foundational California Supreme Court case defining wrongful discharge claim). An ADEA claim, by contrast, only deals with age discrimination. Here, Plaintiff's wrongful discharge claim seeks to incorporate contractual theories and state law discrimination theories that might provide a basis for a wrongful discharge claim but would be unrelated to an ADEA claim. It thus appears that count two was drafted to cover the wider scope of a wrongful discharge claim, rather than the narrower scope of an ADEA claim.

Third, neither the fact that the allegations in Plaintiff's wrongful discharge claim might also support an ADEA claim, nor the fact that Plaintiff identified the ADEA as a source of public policy, transform the wrongful discharge claim into an ADEA claim. The Ninth Circuit considered and rejected a similar argument in *Rains*. There, Rains pled the same type of wrongful discharge claim that Plaintiff asserts here. *See* 80 F.3d at 343. Rains' complaint referenced Title VII as well as CFEHA. *Id.* The Ninth Circuit held that "[t]he direct and indirect references to Title VII in [Rains'] two state law causes of action do not make those claims into federal causes of action. Rather, the complaint merely incorporates Title VII as one of several similar sources of public policy supporting defendant's state law claims." *Id.* at 344. The Ninth Circuit also stated that the fact "[t]hat the same facts could have been the basis for a Title VII claim does not make Rains' wrongful termination claim into a federal cause of action." *Id.* Thus, "[w]hile Rains named Title VII as one of several similar bases for determining the applicable public policy in his

United States District Court
Northern District of California

state law cause of action, he did not file a Title VII claim." *Id.*

Similarly, "multiple courts applying California law have held that a complaint's citation to a statutory provision does not transform a common law cause of action for wrongful termination in violation of public policy into a statutory cause of action." *Madani v. County of Santa Clara*, 2017 WL 1092398, at *9 (N.D. Cal. Mar. 23, 2017) (citing *Miklosy v. Regents of the Univ. of Cal.*, 44 Cal. 4th 876, 899 (2008); *Ortiz v. Lopez*, 688 F. Supp. 2d 1072, 1078-79 (E.D. Cal. 2010)). "Indeed, a claim for wrongful termination in violation of public policy usually must be 'carefully tethered to fundamental policies that are delineated in constitutional or statutory provisions.'" *Id.* (quoting *Gantt v. Sentry Ins.*, 1 Cal. 4th 1083, 1095 (1992)). "Thus, almost every claim for wrongful termination in violation of public policy will cite to a statutory of constitutional provision or policy to state a cause of action." *Id.*

Here, Plaintiff's reference to the ADEA in the context of his wrongful discharge claim does not transform the wrongful discharge claim into an ADEA claim. *See id.* The fact that the allegations in the wrongful discharge claim might also support an ADEA claim does not matter where Plaintiff did not plead a separate ADEA claim.

The Court thus construes Count Two as a state law wrongful discharge claim. Plaintiff has not alleged an independent ADEA claim.

The Court DENIES leave to amend to add an ADEA claim because the Court previously placed Plaintiff on notice that he had failed to clearly state an ADEA claim, *see* ECF No. 99 at 9 n.2, 36. The Court then analyzed the substantive deficiencies of any attempted ADEA claim and stated that "[i]f Plaintiff fails to . . . cure the § 1983 and ADEA deficiencies identified in this order, those claims will be dismissed with prejudice." The FAC failed to cure the deficiencies identified by the Court. Moreover, the Court finds that allowing yet another round of amendment due to Plaintiff's failure to cure a deficiency of which he had notice would cause undue delay. Specifically, the Court would not be able to rule on another motion to dismiss for at least five months due to the Court's congested docket. In addition, the Court finds that allowing Plaintiff

39

leave to amend to cure a deficiency of which Plaintiff clearly had notice would prejudice Defendants by requiring them to file yet another motion to dismiss in a case where Defendants have already had to oppose three preliminary injunction motions, and two interlocutory appeals, as well as file an anti-SLAPP motion and two motions to dismiss. Burdening Defendants with yet another round of briefing based either on Plaintiff's tactical decision to plead his claim as a wrongful discharge claim or Plaintiff's carelessness in failing to heed the Court's first order is not warranted. *See Carvalho*, 629 F.3d at 892-93 (stating that a court "may exercise its discretion to deny leave to amend due to undue delay," "undue prejudice to the opposing party," or "repeated failure to cure deficiencies by amendments previously allowed"); *Bautista*, 216 F.3d at 841 (citing docket congestion as a relevant factor).

These circumstances are thus distinguishable from those in *Bautista*, where the Ninth Circuit held that a district court abused its discretion for dismissing a case with prejudice based on the plaintiff's failure to comply with Rule 10(b). In *Bautista*, the district court's first order dismissing the case was "bare-bones," "did not specify what it required in the pleading," and "gave no warning that it would dismiss the next complaint with prejudice if it did not comply." *See Bautista*, 216 F.3d at 841. Here, by contrast, the Court's December 5, 2017 order put Plaintiff on notice that he had failed to clearly allege an ADEA claim. The Court then analyzed the substantive deficiencies of any attempted ADEA claim and stated that "[i]f Plaintiff fails to . . . cure the § 1983 and ADEA deficiencies identified in this order, those claims will be dismissed with prejudice." ECF No. 99 at 45.

### 3. State Law Claims

After dismissal of the § 1983 claim, the following state law claims remain: wrongful discharge, intentional infliction of emotional distress, breach of contract, breach of the covenant of good faith and fair dealing, and defamation. A federal court may exercise supplemental jurisdiction over state law claims "that are so related to claims in the action within [the court's] original jurisdiction that they form part of the same case or controversy under Article III of the

40

United States District Court
Northern District of California

1    United States Constitution." 28 U.S.C. § 1367(a). Conversely, a court may decline to exercise

2    supplemental jurisdiction where it "has dismissed all claims over which it has original

3    jurisdiction." 28 U.S.C. § 1367(c)(3); *see also Albingia Versicherungs A.G. v. Schenker Int'l,*

4    *Inc.*, 344 F.3d 931, 937-38 (9th Cir. 2003) (as amended) (holding that Section 1367(c) grants

5    federal courts the discretion to dismiss state law claims when all federal claims have been

6    dismissed). Typically, the Court would proceed directly to analyzing whether to retain

7    supplemental jurisdiction over the state law claims. However, because Plaintiff's wrongful

8    discharge claim incorporates an alleged underlying ADEA violation, and because Plaintiff invoked

9    federal jurisdiction under the ADEA, the Court examines whether the wrongful discharge claim

10   presents a federal question such that the Court would have original jurisdiction over the wrongful

11   discharge claim.

12         Generally speaking, "[a] cause of action arises under federal law only when the plaintiff's

13   well-pleaded complaint raises issues of federal law." *Hansen v. Blue Cross of Cal.*, 891 F.2d

14   1384, 1386 (9th Cir. 1989). Typically, a complaint that asserts only state law claims does not arise

15   under federal law. *Met. Life Ins. Co. v. Taylor*, 481 U.S. 58, 63 (1987). Federal question

16   jurisdiction will lie over state law claims like Plaintiff's wrongful discharge claim only "in certain

17   cases" where those state law claims "implicate significant federal issues." *Grable & Sons Metal*

18   *Prods., Inc. v. Darue Eng'g & Mfg.*, 545 U.S. 308, 312 (2005). Under *Grable*, a federal court may

19   exercise jurisdiction over a state law claim only if (1) the action necessarily raises a federal issue

20   that is (2) disputed and (3) substantial, and if (4) the court may entertain the case without

21   disturbing the congressionally approved balance of federal and state judicial responsibilities. *Id.* at

22   314; *see Williston Basin Interstate Pipeline Co. v. An Exclusive Gas Storage Leasehold*, 524 F.3d

23   1090, 1100 (9th Cir. 2008) (citing standard from *Grable*). The party seeking to establish

24   jurisdiction must justify a need for "the experience, solicitude, and hope of uniformity that a

25   federal forum offers on federal issues." *Grable*, 545 U.S. at 312.

26         Here, Plaintiff's wrongful discharge claim does not necessarily raise a federal issue. The

27

28

41

Ninth Circuit has considered very similar cases at least twice, in *Rains* and *Glanton v. Harrah's Entertainment, Inc.*, 297 F. App'x 685 (9th Cir. 2008) (unpublished), and in both cases found that no federal issue was necessarily raised. In *Rains*, as mentioned above, the plaintiff raised the same California state law wrongful discharge claim that Plaintiff raises here and invoked the violation of a federal statute as one of the underlying public policies that his firing violated, as Plaintiff does here. The Ninth Circuit explained that "[t]he invocation of Title VII as a basis for establishing an element of a state law cause of action does not confer federal question jurisdiction when the plaintiff also invokes a . . . state statute that can and does serve the same purpose." 80 F.3d at 345. Specifically, the Ninth Circuit explained that CFEHA prohibits discrimination on the basis of religion just as Title VII does. Thus, the Ninth Circuit held that "[w]hen a claim can be supported by alternative and independent theories—one of which is a state law theory and one of which is a federal law theory—federal question jurisdiction does not attach because federal law is not a necessary element of the claim." *Id.* at 346.

Similarly, in *Glanton*, the plaintiff brought a constructive discharge claim under Nevada law. One element of the constructive discharge claim is "a showing of intolerable working conditions and/or a violation of Nevada public policy." 297 F. App'x at 687. Citing *Rains*, the Ninth Circuit held that the constructive discharge claim did not necessarily raise a federal issue:

> Although Glanton's complaint alleges violations of "EPA, OSHA" and "federal statutes and regulations," these violations are not the sole means of establishing intolerable working conditions or violations of Nevada public policy. Indeed, Glanton alleges violations of state statutes and regulations that prohibit the same or similar conduct as their federal counterparts and do not depend on their federal counterparts. Because there are alternative and independent theories, the district court did not have subject matter jurisdiction over Glanton's claims.

*Id.*

Here, like in *Rains* and *Glanton*, Plaintiff's wrongful discharge claim references federal law (the ADEA) as well as state law (CFEHA) as bases for the wrongful discharge claim. *See* FAC ¶ 61. Because both the ADEA and CFEHA prohibit age discrimination, the wrongful discharge claim "can be supported by alternative and independent theories." *Rains*, 80 F.3d at

346; *see Stevenson v. Super. Ct.*, 16 Cal. 4th 880, 885 (1997) (holding that CFEHA's prohibition against age discrimination can "support a common law action for tortious wrongful discharge"). Thus, because federal law is not a necessary element of the wrongful discharge action, the wrongful discharge action does not invoke federal question jurisdiction. *See Rains*, 80 F.3d at 345-46. The wrongful discharge claim is thus treated as a state law claim for jurisdictional purposes. The Court must next consider whether to retain supplemental jurisdiction over the state law claims.

In considering whether to retain supplemental jurisdiction, a court should consider factors such as "economy, convenience, fairness, and comity." *Acri v. Varian Assocs.*, 114 F.3d 999, 1001 (9th Cir. 1997) (en banc) (citations and internal quotation marks omitted). However, "in the usual case in which all federal-law claims are eliminated before trial, the balance of factors . . . will point toward declining to exercise jurisdiction over the remaining state law claims." *Exec. Software N. Am., Inc. v. U.S. Dist. Court*, 24 F.3d 1545, 1553 n.4 (9th Cir. 1994) (emphasis omitted), *overruled on other grounds by Cal. Dep't of Water Res. v. Powerex Corp.*, 533 F.3d 1087 (9th Cir. 2008).

Here, the factors of economy, convenience, fairness, and comity support dismissal of Plaintiff's remaining state law theories of relief. This case is still at the pleading stage, and no discovery has taken place. Federal judicial resources are conserved by dismissing the state law theories of relief at this stage. The Court finds that dismissal promotes comity as it enables California courts to interpret questions of state law. For these reasons, the Court declines to exercise supplemental jurisdiction over Plaintiffs' state law theories of relief. The state law claims are thus DISMISSED without prejudice to Plaintiff refiling these claims in state court.

The Court next turns to Plaintiff's third motion for a preliminary injunction.

## C.     Third Motion for Preliminary Injunction

Following SCU's termination of Plaintiff's employment, Plaintiff filed a third preliminary injunction motion in which he seeks reinstatement to his tenured professorship. *See* ECF No. 145

United States District Court
Northern District of California

at 1. The Ninth Circuit distinguishes between prohibitory and mandatory injunctions. "A prohibitory injunction preserves the status quo." *Stanley*, 13 F.3d at 1320. A mandatory injunction, by contrast, "orders a responsible party to 'take action.'" *Garcia*, 786 F.3d at 740 (quoting *Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.*, 571 F.3d 873, 879 (9th Cir. 2009)). Here, the nature of the injunctive relief that Plaintiff seeks has thus changed from a prohibitory injunction (preventing SCU from suspending or firing Plaintiff) to a mandatory injunction (reinstating Plaintiff).

This change in the nature of the injunctive relief that Plaintiff seeks is significant because "a mandatory injunction 'goes well beyond simply maintaining the status quo *pendent lite* [and] is particularly disfavored.'" *Garcia*, 786 F.3d at 740 (quoting *Stanley*, 13 F.3d at 1320 (alteration in original)). Under Ninth Circuit precedent, a plaintiff seeking a mandatory injunction carries a higher burden than a plaintiff seeking a prohibitory injunction. *See Hernandez*, 872 F.3d at 999 (recognizing criticism of different standards for mandatory and prohibitory injunctions but concluding that Ninth Circuit precedent requires the distinction); *see also Garcia*, 786 F.3d at 740 (calling the burden for a mandatory injunction "doubly demanding"). Thus, "[w]hen a mandatory preliminary injunction is requested, the district court should deny such relief 'unless the facts and law clearly favor the moving party.'" *Id.* (quoting *Anderson*, 612 F.2d at 1114). This is a higher standard than "simply" showing that the plaintiff "is likely to succeed." *Garcia*, 786 F.3d at 740. "In plain terms, mandatory injunctions should not issue in 'doubtful cases.'" *Id.* (quoting *Park Vill. Apartment Tenants Ass'n v. Mortimer Howard Trust*, 636 F.3d 1150, 1160 (9th Cir. 2011)).

The Court thus analyzes Plaintiff's third motion for a preliminary injunction, keeping in mind that Plaintiff carries a higher burden to succeed on his third motion than he did for his first two preliminary injunction motions.

### 1. Likelihood of Success on the Merits

In Section III.B, above, the Court dismissed Plaintiff's § 1983 claim with prejudice after determining that Plaintiff's theory of state action failed as a matter of law and dismissed the state

44

law claims without prejudice to refiling in state court. In similar circumstances, where the entire complaint has been dismissed, this Court and other courts in the Ninth Circuit have found that the plaintiff has failed to establish likelihood of success on the merits. *See, e.g.*, *Prager Univ.*, 2018 WL 1471939 at *14; *Physician's Surrogacy, Inc.*, 2017 WL 3622329 at *12.

Even looking beyond the dismissal of Plaintiff's FAC, however, the Court finds that Plaintiff has not carried his burden to establish a likelihood of success on the merits, let alone that "the law and facts *clearly favor* [his] position." *See Garcia*, 786 F.3d at 740. The section of Plaintiff's preliminary injunction motion devoted to likelihood of success on the merits reads, in full:

> With regard to the likelihood of success on the merits, as shown above, Ms. Jane Doe's accusations are false and fabricated as shown by her own real time emails and actions. The [Faculty Judicial Board]'s "determination" was without due process, without key witnesses, was based on applying the wrong burden of persuasion (which caused the members to feel compelled to find in SCU's favor) and should be given no weight. At a minimum, an evidentiary hearing should be held by this Court where it can get a sense of the witness' [*sic*] credibility. Professor Heineke submits that an unbiased jury will find in his favor.

PI Mot. at 22 (citation omitted). As with the first two preliminary injunction motions, Plaintiff does not address the likelihood of success on any particular claim, nor does Plaintiff explain how these factual allegations relate to the elements of any of his claims. Such a cursory analysis does not satisfy Plaintiff's burden. *See Lopez*, 680 F.3d at 1072; *Dunn*, 2013 WL 12089494 at *2. Although Plaintiff offers somewhat more specificity in his Reply by mentioning some of his specific claims, *see* PI Reply at 1-2, these arguments center on Plaintiff's assertions that Doe's allegations are fabricated and that SCU and its investigation was biased against Plaintiff. As discussed in more detail below, Plaintiff has not shown that he is likely to succeed in proving either of these underlying factual allegations.

Accordingly, even though (1) the Court has dismissed all of Plaintiff's claims and (2) Plaintiff has failed to explain in his preliminary injunction motion how his factual allegations support his claims, either of which would be a sufficient ground for finding that Plaintiff has failed to establish a likelihood of success on the merits or serious questions going to the merits, the Court

nonetheless analyzes Plaintiff's motion's arguments for why he has established a likelihood of success on the merits. First, Plaintiff contends that the friendly tenor of Jane Doe's emails to Plaintiff and the fact that Doe continued to seek out Plaintiff's help during office hours prove that Plaintiff did not sexually harass Doe. PI Mot. at 8-9, 22; PI Reply at 4-10. Plaintiff explains:

> The overwhelming evidence shows there was no sexual harassment. The real reason she suddenly refused to be his TA and falsely fabricated these sexual harassment lies—not because she had been sexually harassed for eight months—she hadn't been, as clearly shown by her emails and actions—but because she was not prepared. . . . So she lied—she fabricated sexual harassment claims by taking small bits of innocent events—<u>her</u> welcoming hugs, <u>her</u> requests to meet at his office, <u>her</u> requests for lunch, their walking down the stairs to go to lunch, <u>her</u> questions to Professor Heineke about his wife when she saw her picture in his office, <u>her</u> questions about his house in the mountains after she saw of a picture of it in his office, the Tesla he drove her to lunch in, his class lectures and discussions about the reality of the business world and the glass ceiling for women, especially if they got pregnant and took maternity leave. Jane Doe twisted these innocent events and wove them into a garbage basket of false sexual harassment accusations . . . .
>
> The falsity of the supposed, continuous sexual harassment in his office is shown not only by her emails, but by her actions, i.e., her attempts to weasel out of her own emails and actions will be seen for what they are—lies. The truth is, she went to his office repeatedly because it was SAFE. She went there because she wasn't being sexually harassed. She wasn't "disgusted" by Professor Heineke. She thought he was "sweet" and a great and excellent Professor who helped her and other students and she felt lucky to have him as a professor. He was a "friend" who she confided in about her classes and career <u>after</u> she had completed his class. Someone who had been sexually harassed would not do that.
>
> . . . We believe it is clear that she is lying now in an effort to negate the damning effect of her own emails and actions because she thinks that will help her now in this litigation. She is lying now, just as she was lying on September 7, and 9 when she falsely made up the sexual harassment accusation, because that would be a face saving excuse to help her avoid the shame of not being prepared or able to do the TA job she had promised to do. She reneged on her promise—she failed to prepare—but being the self-centered, excuse making person that she is, she could not admit her own failings, so she fabricated an excuse—sexual harassment. . . .

PI Reply at 8-10.

However, during her testimony at the Faculty Judicial Board hearing, Doe apparently

offered another explanation as to why she would send friendly emails and continue to seek help from Plaintiff even if he was harassing her: she wanted to get a good grade and was interested in the prestigious TA position. PI Reply at 9-10; *see also* ECF No. 130-3 at 262 (Doe told the investigator that she tolerated Plaintiff's actions because she was interested in the TA position). Although Plaintiff offers this testimony as evidence that Doe "is an admitted liar," *id.* at 9, the Court finds Doe's explanation plausible, particularly given that Doe was a student of Plaintiff's at the time and Plaintiff would determine her grade in the course. Accordingly, the Court finds that Doe's emails and repeated visits to Plaintiff's office are consistent with both Plaintiff's and Doe's versions of events. Even if these facts weigh in Plaintiff's favor, they do not prove that Doe fabricated her accusations. *See Kebede v. Ashcroft*, 366 F.3d 808, 811 (9th Cir. 2004) ("A victim of sexual assault does not irredeemably compromise his or her credibility by failing to report the assault at the first opportunity.").

Next, Plaintiff argues that the Faculty Judicial Board proceedings did not afford him due process. PI Mot. at 22. As the Court has explained in great detail in its December 5, 2017 order dismissing the original complaint and in the instant order, Plaintiff's due process claim fails as a matter of law for lack of state action. Similarly, Plaintiff cites no authority for his apparent beliefs that a private university's disciplinary process must incorporate all of the procedural protections that apply in federal court or that a private university can only terminate a tenured faculty member if the university proves beyond a reasonable doubt in a court proceeding that misconduct occurred. *See* FAC ¶ 60 ("The due process standard should be *beyond a reasonable doubt with full right to compel witnesses and cross-examine them . . . .*"); PI Mot. at 15, 22-23; Reply at 11 ("SCU can still seek to prove the sexual harassment charge, but in court with due process and a fair trial. If SCU can prove the accusation at trial, then it will be able to suspend or terminate him."). This is simply not the law, even for public employees. *Cf. Loudermill*, 470 U.S. at 542-46 (discussing constitutional due process requirements for pretermination hearing, including oral or written notice of the charges, an explanation of the employer's evidence, and an opportunity for the employee to

tell his side of the story); *Roybal v. Toppenish School Dist.*, 871 F.3d 927, 933 (9th Cir. 2017)

(contrasting Washington state law, which guarantees employees "notice and a trial-like

predeprivation hearing to determine whether the adverse employment action is supported by

probable cause," with federal due process minimums as defined in *Loudermill*); *Brewster v. Bd. of*

*Educ. Of Lynwood Unified School Dist.*, 149 F.3d 971, 985 (9th Cir. 1998) ("The hearing need not

even approximate a trial-like proceeding; in fact, it may be 'very limited' and still pass

constitutional muster."); *Walker v. President & Fellows of Harvard College*, 82 F. Supp. 3d 524,

532 (D. Mass. 2014) ("[a] university is not required to adhere to the standards of due process

guaranteed to criminal defendants or to abide by rules of evidence adopted by courts" (quoting

*Schaer*, 432 Mass. at 482) (alteration in original)).

Plaintiff also contends that the Faculty Judicial Board applied the wrong burden of

persuasion. PI Mot. at 22. Plaintiff does not specify what cause of action this issue relates to, but

the Court assumes it goes to Plaintiff's breach of contract claim. Based on the exhibits that

Plaintiff submitted in support of his third motion for a preliminary injunction, it appears that

Plaintiff's argument is that his dismissal was pursuant to § 3.9 of the Faculty Handbook, which

governs dismissals for misconduct. *See* Exh. 10 to PI Mot. Faculty Handbook § 3.10.2.3(12)

provides that "[t]he burden of persuasion in matters before the hearing committee shall be satisfied

only by a preponderance of the evidence. In cases governed by 3.9 (Misconduct and Diminished

Fitness) the burden rests upon the University. In all other cases, the burden rests upon the party

invoking the jurisdiction of the Faculty Judicial Board." ECF No. 130-3 at 122. Plaintiff thus

contends that the Faculty Judicial Board erred when it placed the burden of persuasion on Plaintiff

because his case was governed by § 3.9. Exh. 10 to PI Mot.

The Faculty Judicial Board considered Plaintiff's argument and responded that § 3.10.2.2

"specifies that the Faculty Judicial Board has jurisdiction in a variety of instances, and it

distinguishes between 'cases of sanction for misconduct, as provided in 3.9' (3.10.2.2(3)) and

'cases designated in the Policy on Unlawful Harassment and Discrimination' (3.10.2.2(5))." Exh.

Case No. 17-CV-05285-LHK
ORDER DENYING MOTIONS FOR PRELIMINARY INJUNCTION, GRANTING MOTION TO DISMISS, AND
GRANTING MOTION TO STRIKE SUR-OPPOSITION

11 to PI Mot.; *see also* ECF No. 130-3 at 119. Because Plaintiff was sanctioned under the Policy on Unlawful Harassment and Discrimination and not for misconduct under § 3.9, the Faculty Judicial Board reasoned that Plaintiff was the party invoking the jurisdiction of the Faculty Judicial Board and thus Plaintiff bore the burden of persuasion pursuant to § 3.10.2.3(12). Exh. 11 to PI Mot. The letter from Dennis Jacobs suspending Plaintiff makes clear that his suspension was pursuant to "the University's Policy on Unlawful Harassment and Unlawful Discrimination." Exh. 6 to PI Mot. Thus, the Court agrees with the Faculty Judicial Board's determination that Plaintiff bore the burden of persuasion under the procedures outlined in the Faculty Handbook. As a result, the Faculty Judicial Board did not apply the wrong burden of persuasion.

Accordingly, none of the arguments that Plaintiff makes in his motion for a preliminary injunction establish a likelihood of success on the merits or serious questions going to the merits, let alone that the law and facts clearly favor Plaintiff's position.

Finally, because the Ninth Circuit highlighted age discrimination in its remand order, the Court assesses the strength of Plaintiff's age discrimination claim even though Plaintiff did not specifically brief the likelihood of success on the merits of his age discrimination claims in his third motion for a preliminary injunction. "When a plaintiff seeks injunctive relief based on claims not pled in the complaint, the court does not have the authority to issue an injunction." *Pacific Radiation Oncology, LLC v. Queen's Medical Center*, 810 F.3d 631, 633 (9th Cir. 2015). As explained above, Plaintiff did not allege a standalone age discrimination claim under the ADEA. Nor did Plaintiff allege a standalone age discrimination claim under state law. Thus, the Court cannot issue a preliminary injunction based on age discrimination alone. The Court's analysis thus considers age discrimination only insofar as it would support Plaintiff's wrongful discharge cause of action.

"The elements of a claim for wrongful discharge in violation of public policy are (1) an employer-employee relationship, (2) the employer terminated the plaintiff's employment, (3) the termination was substantially motivated by a violation of public policy, and (4) the discharge

49

caused the plaintiff harm." *Nosal-Tabor v. Sharp Chula Vista Medical Center*, 239 Cal. App. 4th 1224, 1234-35 (2015) (quoting *Yau v. Allen*, 229 Cal. App. 4th 144, 154 (2014)). The public policy violated must be "(1) delineated in either constitutional or statutory provisions; (2) 'public' in the sense that it 'inures to the benefit of the public' rather than serving merely the interests of the individual; (3) well established at the time of discharge; and (4) substantial and fundamental." *Freund v. Nycomed Amersham*, 347 F.3d 752, 758 (9th Cir.2003) (quoting *City of Moorpark v. Super. Ct.*, 18 Cal.4th 1143, 1159 (1998)). The California Supreme Court has held that violation of CFEHA's prohibition of age discrimination can support a wrongful discharge claim. *See Stevenson*, 16 Cal. 4th at 885. Presumably the same reasoning would apply to a violation of the ADEA.

The first, second, and fourth elements of the wrongful discharge cause of action are not seriously disputed here. The parties do dispute the third element—whether Plaintiff's termination was substantially motivated by age discrimination. Accordingly, the Court analyzes whether Plaintiff has established a likelihood of success of proving that his termination was substantially motivated by age discrimination. To do so, the Court turns to the ADEA and CFEHA. *See Stevenson*, 16 Cal. 4th at 904-05 (holding that "when a plaintiff relies upon a statutory prohibition to support a common law cause of action for wrongful termination in violation of public policy, the common law claim is subject to statutory limitations affecting the nature and scope of the statutory prohibition").

Under both the ADEA and the CFEHA, when a plaintiff relies on indirect evidence of discrimination, then analysis of an age discrimination claim employs the burden-shifting framework from *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Enlow v. Salem-Keizer Yellow Cab Co.*, 389 F.3d 802, 812 (9th Cir. 2004); *Guz v. Bechtel Nat'l, Inc.*, 24 Cal. 4th 317, 354 (2000). At the first step of the *McDonnell Douglas* framework, Plaintiff must establish a prima facie case of age discrimination. To do so, Plaintiff must show that (1) he was a member of the protected class, *i.e.* that he was more than 40 years old; (2) that he was performing

United States District Court
Northern District of California

competently in his position; (3) that he was fired; and (4) that he was replaced by someone substantially younger with equal or inferior qualifications. *See Coleman v. Quaker Oats Co.*, 232 F.3d 1271, 1281 (9th Cir. 2000); *Guz*, 24 Cal. 4th at 355. Here, Plaintiff has adequately alleged a prima facie case. *See* FAC ¶¶ 1, 16, 46, 53, 61. Thus, a presumption of discrimination arises. *See St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 506 (1993); *Guz*, 24 Cal. 4th at 355.

The burden then shifts to SCU to "produc[e] evidence that the plaintiff was rejected, or someone else was preferred, for a legitimate, nondiscriminatory reason." *Enlow*, 389 F.3d at 812 (quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142 (2000)); *see Guz*, 24 Cal. 4th at 355-56. "This burden is one of production, not persuasion; it 'can involve no credibility assessment.'" *Reeves*, 530 U.S. at 142 (quoting *St. Mary's Honor Center*, 509 U.S. at 509). Here, SCU has met its burden of production by producing admissible evidence that Plaintiff was fired because he was found to have violated SCU's Gender-Based Discrimination and Sexual Misconduct Policy. Accordingly, the presumption of discrimination disappears. *See id.* at 142-43; *Guz*, 24 Cal. 4th at 356.

The burden thus shifts back to Plaintiff "to prove by a preponderance of the evidence that the legitimate reasons offered by [SCU] were not its true reasons, but were a pretext for discrimination." *Reeves*, 530 U.S. at 143; *Guz*, 24 Cal. 4th at 356. "A plaintiff may demonstrate pretext in either of two ways: (1) directly, by showing that unlawful discrimination more likely than not motivated the employer; or (2) indirectly, by showing that the employer's proffered explanation is unworthy of credence because it is internally inconsistent or otherwise not believable." *Earl v. Nielsen Media Research, Inc.*, 658 F.3d 1108, 1112-13 (9th Cir. 2011). With respect to indirect evidence, the U.S. Supreme Court explained in *Reeves* that a trier of fact could "reasonably infer from the falsity of the explanation that the employer is dissembling to cover up a discriminatory purpose," but the U.S. Supreme Court also made clear that such an inference is not automatic. 530 U.S. at 147; *Guz*, 24 Cal. 4th at 361-62. In other words, "[t]he ultimate question is whether the employer intentionally discriminated, and proof that 'the employer's proffered reason

51

is unpersuasive, or even obviously contrived, does not necessarily establish that the plaintiff's proffered reason . . . is correct.'" *Reeves*, 530 U.S. at 146-47 (quoting *St. Mary's Honor Center*, 509 U.S. at 524) (alterations in original); *see Guz*, 24 Cal. 4th at 361-62 ("[A]n inference of intentional discrimination cannot be drawn solely from evidence, if any, that the company lied about its reasons. The pertinent statutes do not prohibit lying, they prohibit discrimination."). "It is not enough . . . to *dis*believe the employer, the factfinder must *believe* the plaintiff's explanation of intentional discrimination." *Reeves*, 530 U.S. at 147 (quoting *St. Mary's Honor Center*, 509 U.S. at 519) (alteration in original).

Here, Plaintiff offers no "direct evidence of discrimination, such as comments from supervisors betraying bias or animus against older workers." *Earl*, 658 F.3d at 1113. Instead, Plaintiff attacks SCU's proffered explanation. At its core, Plaintiff's theory appears to be that SCU used Doe's false harassment complaint as a vehicle to fire Plaintiff because of his age. PI Mot. at 16. Specifically, Plaintiff alleges (1) that Doe fabricated her allegations in order to create a face-saving way to withdraw from the TA position, to help Doe's friend, and to create a cover for SCU to fire Plaintiff based on his age, FAC ¶¶ 26, 28, 34, 36, 43; and (2) that the investigation suffered from procedural and substantive deficiencies, FAC ¶¶ 39-40, 44, 52.

After reviewing the hundreds of pages of evidence offered by both sides, the Court is not persuaded that Plaintiff has shown that he is likely to succeed in establishing that "age was the 'but-for' cause of the challenged employment decision." *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 176 (2009); *see Alliance for the Wild Rockies v. Pena*, 865 F.3d 1211, 1217 (9th Cir. 2017) (finding that serious questions standard is a "lesser showing than likelihood of success on the merits"). As stated above and as the U.S. Supreme Court explained in *Reeves*, a factfinder *might* infer from Plaintiff's attack on Doe's allegations and SCU's investigation that SCU used the allegations as a pretext to fire Plaintiff based on his age. 530 U.S. at 148. In the Court's view, however, the likelihood of a factfinder drawing this inference is low based on the implausibility of Plaintiff's allegations, considered individually and as a whole. Specifically, Plaintiff's theory is

52

that Doe falsely accused Plaintiff of sexual harassment in 2015 because it was a more face-saving way to withdraw from her commitment to be his TA than simply admitting that she was unprepared. *See, e.g.*, PI Reply at 10; ECF No. 130-3 at 245. Doe then made a report to SCU's EEO office that she chose not to pursue in 2015. ECF No. 130-3 at 263. According to Plaintiff, when an investigator in a separate case approached Doe about her allegation in 2017, Doe agreed to be interviewed because she wanted to help SCU create a pretext to fire Plaintiff based on his age. FAC ¶ 43. Plaintiff also asserts that Doe cooperated with the investigation in order to help her friend, the complainant in the other case against Plaintiff, who was also a foreign student.

However, Plaintiff does not explain why a student would believe that falsely accusing her professor of sexual harassment would be a less embarrassing way of withdrawing from a professional commitment than either telling the truth (according to Plaintiff, that Doe was unprepared) or any other less confrontational, emotionally charged excuse. As the proceedings in this case make clear, an accusation of sexual harassment, whether false or true, can lead to years of investigation and public attacks on Doe's credibility and personal and professional conduct. Plaintiff's theory that Doe would fabricate the allegations and then continue to stand by them for years thus appears implausible. Plaintiff also does not explain why Doe would bother making a formal report to the EEO office if her only goal was to withdraw from her TA commitment. Nor does Plaintiff explain his basis for asserting that Doe and the other accuser were friends, beyond that they were both foreign students from China. ECF No. 1 ¶ 34; FAC ¶¶ 34, 36. To the contrary, the report of investigation into the other accuser's allegations makes clear that the other accuser did not even know Doe's name as of March 23, 2017, which makes it unlikely that Doe was driven by any friendship with the other accuser. *See* ECF No. 130-3 at 227-28.

According to Plaintiff, SCU then instructed the investigator to pursue Doe's allegations so that it could use the investigation as a pretext to fire Plaintiff because of his age. PI Reply at 2. The investigator then interviewed Doe, witnesses, documentary evidence, and responded to Plaintiff's written objections in two reports that totaled more than 100 pages, but Plaintiff

United States District Court
Northern District of California

contends that these reports were biased because SCU's EEO and Title IX Coordinator is a paid consultant with the company hired to do the investigation. PI Reply at 2-4. However, Plaintiff does not explain why, if SCU was seeking a pretextual reason to fire him because of his age and the investigator was willing to produce a biased report, the same investigator cleared Plaintiff with respect to the other student's sexual harassment allegations. *See* ECF No. 130-3 at 214-15 (discussing previous investigation's finding that "there was insufficient evidence to demonstrate that the alleged behaviors were both sexual in nature and sufficiently severe, persistent, or pervasive such that they created a hostile educational environment for the Complainant").

SCU's provost then reviewed the investigation reports, Plaintiff's objections to the reports, and met with Plaintiff. SCU's provost found it more likely than not that Plaintiff had violated SCU's policy prohibiting unlawful harassment. ECF No. 130-3 at 190. SCU's president then reviewed the reports, more than 220 pages of documents submitted by Plaintiff, and interviewed Doe and Plaintiff, among others. SCU's president then affirmed the evidentiary findings and the decision to terminate Plaintiff's employment. ECF No. 130-3 at 199.

Finally, the FJB held a multi-day hearing in which witnesses, including Doe and Plaintiff, testified, and SCU and Plaintiff submitted post-hearing briefs. The FJB explicitly found Doe's testimony "compelling and credible" and doubted Plaintiff's credibility. Exh. 3 to PI Mot at 4. Plaintiff dismisses SCU's process as a series of rubberstamps and kangaroo court proceedings. *See* PI Reply at 5. Again, however, even if Plaintiff succeeds in persuading the factfinder that SCU's process had flaws, finding fault with SCU's disciplinary procedure and finding that SCU used the proceedings as a pretext to fire Plaintiff *because of his age* are not the same thing. Plaintiff has not shown that a factfinder is likely to conclude that his termination was motivated by age.

In fact, Plaintiff has repeatedly offered non-discriminatory reasons for his termination. Plaintiff's original complaint, sworn declaration, and first two preliminary injunction motions stated that SCU sought to lower its costs by replacing Plaintiff, a highly paid tenured professor,

54

with a lesser paid adjunct professor. *See* ECF No. 1 ¶ 55; Heineke Decl. ¶ 31; ECF No. 14 at 15; ECF No. 39 at 15. Although the Court need not decide this issue, the Court notes that it is not immediately clear whether Plaintiff may escape the effect of his previous sworn allegations that SCU was motivated by a desire to cut costs by omitting those allegations in his FAC after the Court ruled that such allegations would cause Plaintiff's age discrimination claim to fail. *See Reddy v. Litton Indus., Inc.*, 912 F.2d 291, 296-97 (9th Cir. 1990) ("Although leave to amend should be liberally granted, the amended complaint may only allege 'other facts consistent with the challenged pleading.'"); *Plevin v. City & County of San Francisco*, 2011 WL 3240536, at *2 (N.D. Cal. July 29, 2011) (same).

Plaintiff has also alleged that certain members of the SCU administration, including SCU General Counsel John Ottoboni, are biased against Plaintiff. *See, e.g.*, PI Reply at 3 n.1. With respect to Ottoboni, Plaintiff apparently told a previous SCU president that Ottoboni "was incompetent and should be fired," which the previous SCU president then told Ottoboni. PI Reply at 3 n.1. A factfinder's conclusion that Plaintiff's termination was motivated by professional grudges or personal dislike would defeat any age discrimination claim.

Here, where the evidence does not suggest that age discrimination is any more likely to be the motivating force behind Plaintiff's termination than a good faith reliance on the investigation and disciplinary process or an alternative, non-discriminatory reason such as a desire to cut costs, which Plaintiff himself alleged under oath was a factor in his termination, Plaintiff has not carried his burden to establish that "he is likely to succeed on the merits" of a wrongful discharge claim based on age discrimination. *See Winter*, 555 U.S. at 20. It follows the Plaintiff has not met the higher burden required of a plaintiff seeking a mandatory injunction to show that the facts and the law clearly favor his position. *See Garcia*, 786 F.3d at 740. Thus, Plaintiff has failed to show a likelihood of success on the merits.

### 2. Irreparable Harm

Plaintiff asserts substantially similar arguments regarding irreparable harm as he did in his

second preliminary injunction motion.  *See* PI Mot. at 16-22.  Accordingly, the Court limits its analysis to the facts that have changed since the first two preliminary injunction motions. Specifically, Plaintiff has now been terminated from his employment, rather than suspended with pay.  However, Plaintiff still has not shown a likelihood of success on the merits of his age discrimination claim.  The Court still concludes that, in the absence of a likelihood of success on a discrimination claim, Plaintiff's harm is closer to the harm in *Sampson*, *Hartikka*, *Kennedy*, and the out-of-circuit and district court cases concerning the termination of university professors than it is to *Chalk*.  Accordingly, Plaintiff has not established that he is likely to suffer irreparable harm in the absence of an injunction.

### 3.  **Balance of Equities**

Again, Plaintiff and Defendants make largely similar arguments related to the balance of equities as they did in relation to the first two preliminary injunction motions.  *See* PI Mot. at 23; PI Opp'n at 9-17, 21-23.  In addition, Doe now states in a declaration that she intends to re-enroll in SCU in fall 2018 to finish her graduate degree.  However, Doe states that she will not re-enroll if Plaintiff is reinstated.  *See* ECF No. 130-1.

Moreover, SCU hired a third party investigator to conduct an investigation, and SCU's provost, SCU's president, and the FJB have reviewed the matter.  Notably, the investigator, SCU's president, and the FJB each separately interviewed Plaintiff and Doe and assessed their credibility. Plaintiff has again failed to demonstrate a likelihood of success on the merits of his claims.

Furthermore, ordering Plaintiff's return to the classroom would unduly interfere in a university's judgment about how best to protect the safety of its students.  Such an intervention also would likely cause victims of sexual misconduct—be they students, staff, or faculty—to question whether SCU would take any meaningful action in response to future complaints. Finally, to the extent that SCU is correct that Plaintiff sexually harassed Doe, ordering Plaintiff's return to the classroom would put other students at risk.

At the same time, Plaintiff's harm has increased now that he has been terminated, rather

56

than merely suspended with pay, although the Court notes that SCU continues to pay for Plaintiff's medical, vision, and dental insurance through his wife, who is a professor at SCU. *See* ECF No. 130-2 (declaration of Erendira Rubin). Plaintiff will likely also continue to suffer emotional distress, reputational harm, and be deprived of the opportunity to continue teaching. To the extent that Plaintiff is correct that he did not sexually harass Doe, such harms will occur despite Plaintiff's innocence. That said, Plaintiff has not established a likelihood of success on any of his claims. Overall, the Court finds that the balance of equities favors Defendants.

### 4. Public Interest

Finally, both sides largely restate the same public interest arguments that they made in relation to the first and second preliminary injunction motions. *See* PI Mot. at 23; PI Opp'n at 22-23. The Court finds Plaintiff's primary argument—that the public interest favors a full trial before the termination of Plaintiff's employment—unpersuasive for the reasons explained above. Specifically, requiring a private employer such as SCU to prove misconduct in court before terminating or even suspending an employee would go far beyond what constitutional due process requires, would hamstring private entities' ability to make personnel decisions, and would flood the courts. *See Loudermill*, 470 U.S. at 542-46 (constitutional due process requires notice and an opportunity to respond before termination from a job in which employee has a property interest, but "the pretermination hearing need not definitively resolve the propriety of the discharge").

Although the Court recognizes that the "public has an interest in assuring that private institutions comport with general notions of procedural fair play," *Ben-Yonatan*, 863 F. Supp. at 988, the public also has an interest in preventing sexual harassment and in allowing private entities to make personnel decisions, so long as those personnel decisions do not violate the law. *See Doe*, 2018 WL 1972461 at *7 (recognizing public interest in university's ability to independently investigate and discipline students for misconduct); *Marshall v. Ohio Univ.*, 2015 WL 1179955, at *10 (S.D. Ohio Mar. 13, 2015) (observing that, absent a showing of likely success on the merits, the court is reluctant to interfere with disciplinary processes); *Ben-Yonatan*, 863 F. Supp. at 988

United States District Court
Northern District of California

(recognizing public interest in harassment-free educational environment).  Here, where Plaintiff has not shown a likelihood of success on the merits of his claims, the Court finds that an injunction would not be in the public interest.

**5. Conclusion**

In conclusion, Plaintiff has failed to carry his higher burden to show that the facts and the law clearly favor his position.  *See Garcia*, 786 F.3d at 740.  Specifically, Plaintiff has failed to show a likelihood of success on the merits or irreparable harm.  Moreover, the Court has dismissed the wrongful termination claim after declining to exercise supplemental jurisdiction over the state law claims.  The Court also found that the balance of equities favors Defendants and that an injunction would not be in the public interest.  Thus, Plaintiff's third motion for a preliminary injunction is DENIED.

## IV.    CONCLUSION

For the foregoing reasons, the Court DENIED all three preliminary injunction motions, GRANTED the motion to dismiss the § 1983 claim with prejudice and GRANTED the motion to dismiss the remaining state law claims without prejudice to refiling the state law claims in state court.  The Court also GRANTED the motion to strike the sur-opposition.  The Clerk shall close the file.

**IT IS SO ORDERED.**

Dated: July 10, 2018

_____
LUCY H. KOH
United States District Judge